# WILKINSON *vs.* MOSELEY.

[CASE AGAINST HIRER OF SLAVE FOR NEGLIGENCE.]

1. *Misjoinder of counts available on general demurrer.*—A misjoinder of counts may be taken advantage of on general demurrer to the declaration.

2. *Amendment of declaration after demurrer sustained.*—After a demurrer has been sustained to a declaration, on account of a misjoinder of counts, the court is authorized (Clay's Digest, 334, § 19) to grant an amendment on terms.

3. *Joinder of case and trover.*—Case and trover may be joined, in different counts, in the same declaration.

4. *Plea must go as far as it professes.*—A plea which assumes to answer the whole declaration, but which does not negative the cause of action set out in each count, is demurrable.

5. *Frivolous plea stricken out on motion.*—When non assumpsit is pleaded to an action on the case in tort, it may be stricken out on motion.

6. *What witness may state.*—A witness, not a physician or midwife, may testify to the physical condition of a slave, and may state that said slave "was sick,"—"had fever,"—"was pregnant," &c.

7. *When objection to deposition must be made.*—When a deposition is taken on interrogatories, which are crossed without objection, a motion to exclude one of the answers, which is responsive to the interrogatory, on the ground that it states the mere opinion of the witness, comes too late at the trial.

8. *Declarations of slave, while sick, admissible as part of res gestæ.*—The declarations of a slave, while sick, as to the nature of her disease, are admissible evidence on the principle of *res gestæ*, as well as from the necessity of the case, although made to a person who is not a physician.

9. *Form of question to physician.*—A physician may be asked to give his opinion, on a hypothetical state of facts, as to the condition of a person whom he had never seen; but he cannot be asked his opinion, "whether, from the condition of" a slave, "as described by the witnesses M. and L.," whose testimony is conflicting, "the attention of a physician was necessary."

10. *Misrepresentation in hiring slave.*—If a slave is falsely represented by her owner, at the time of hiring her, to be a good cook, washer, and ironer, such

misrepresentation authorizes the hirer to rescind the contract, but gives him no right to sub-hire the slave to another person, to be employed in a service different from that specified in his own contract.

11. *Relevancy of evidence to prove value of slave.*—In an action to recover damages for the loss of a hired slave, defendant may adduce evidence showing that said slave was not a good cook, washer, and ironer. (Per Walker, J.; Stone, J., holding that such evidence was not admissible, unless plaintiff had introduced evidence to the contrary; and Rice, C. J., not sitting.)

12. *Proof of custom on question of negligence in treatment of hired slave.*—In such action, a witness for defendant may testify "that prudent planters generally did not call a physician to attend their negroes, unless in dangerous cases; but that they permitted their overseers to administer medicines to slaves when sick, except in dangerous cases, when physicians were called in."

13. *When failure to call in physician is not negligence.*—The mere failure to call in a physician to a hired slave, when sick, does not constitute negligence on the part of the hirer, if the disease is plain and simple, and the generality of mankind, in such cases, administer medicines without calling in a physician.

4. *Difference between counts in case and trover.*—A count, alleging that, under a contract by which defendant hired a slave from plaintiff, to be used and employed as a cook in a specified city, it became defendant's duty there to employ the slave in that capacity, and not otherwise or elsewhere; that defendant, disregarding his duty in that behalf, employed said slave as a field-hand on a plantation; and that, by means thereof, said slave died, and was wholly lost to plaintiff,—is a count in trover, and not in case.

15. *Waiver of conversion.*—If the owner of a hired slave, with full knowledge of a conversion during the term, afterwards transfers to another the note given for the hire, without any deduction, and the note is paid by the hirer,—the owner is estopped from afterwards bringing trover for the conversion.

16. *Hirer's liability for loss of slave.*—To authorize a recovery in case against the hirer of a slave, when it is shown that the slave died in his possession before the expiration of the term of hiring, it must appear that the death resulted from some violation of duty on his part.

Appeal from the Circuit Court of Montgomery.

Tried before the Hon. John Gill Shorter.

This action was brought by Robert A. Moseley against Beverly N. Wilkinson, to recover damages for the loss of a hired slave. The case was before this court at two former terms, and was each time reversed and remanded.— See 18 Ala. 288; 24 Ala. 411. A demurrer was sustained to the whole declaration, on account of a misjoinder of counts; and leave was granted to the plaintiff to amend, on payment of costs. The plaintiff then filed a new declaration, containing three counts, the last of which was a count in trover. The first count of the new declaration

averred, that on the 1st February, 1844, plaintiff hired to defendant two slaves, Squire and Adeline, for the space of one year from that time, for a certain reasonable reward, and then and there delivered said slaves to defendant; that it thereby became defendant's duty "to take due and proper care of said slaves," and, in the event of their sickness, "to bestow upon them proper care, medical treatment and attention"; that the woman Adeline became sick during the term, and required medical treatment; and that defendant, disregarding his duty in that behalf, failed and neglected to bestow or procure for her proper medical attendance and treatment; by means whereof, she became wholly lost to plaintiff. The second count averred, that plaintiff hired to defendant said two slaves, from the 1st February, 1844, to the 1st January, 1845, to be used and employed by defendant in the city of Montgomery, and Adeline to be employed as a cook; that it thereby became defendant's duty to employ said slave in the manner specified in said contract, and not otherwise; that defendant, in breach of his duty in that behalf, used and employed said Adeline as a field-hand on a plantation outside of the city of Montgomery; and that, by means thereof, she died, and became wholly lost to plaintiff.

To this declaration the following pleas were filed:

1. That defendant had possession of said slave Adeline under and by virtue of a contract of hiring from plaintiff, from the 1st February, 1844, to the 1st January, 1845; and that she died before the expiration of said term.— 2. (In addition to the facts stated in the first plea,) That after the death of said slave, and with full knowledge of her death, and of the manner in which she had been used and employed by defendant, plaintiff received and collected the entire amount due by the note given for the hire, and thereby ratified defendant's use and employment of said slave.—3. *Non assumpsit* to the first and second counts, and not guilty to the third.—4. Not guilty, to each count. 5. (After averring the contract of hiring, and the death of the slave before the expiration of the term, as in the first and second counts,) "That the damages sought to be

recovered arise out of the supposed violation by defend-
ant of said contract, after it was made, and before the
death of said slave.—6. "The same allegations contained
in the 1st, 2d, and 5th pleas,— all in short by consent."

The plaintiff demurred to the 1st, 2d, 5th, and 6th
pleas; took issue on the 4th, and moved the court to
strike out the 3d. The court sustained each demurrer,
and also struck out the 3d plea; and the cause was sub-
mitted to the jury on issue joined on the 4th plea.

The facts disclosed on the trial are thus stated in the
bill of exceptions:

"The plaintiff introduced as a witness his brother, P.
O. Moseley, who testified, that he was present in January,
1844, when plaintiff hired to defendant two negroes, Ade-
line and Squire, for the year 1844, or until christmas of
that year,—the former at $90, and the latter at $50; that
the conversation commenced by plaintiff telling defend-
ant he understood he (defendant) wanted to hire negroes;
and, on defendant replying that he did, plaintiff asked
what sort of negroes he wanted; that defendant answered,
he wanted a cook, washer and ironer, and a boy to wait
in his store; that plaintiff then said, he thought he could
suit defendant—that he had an old and experienced cook,
washer and ironer, whom he could recommend, a girl who
had cooked in the country for two years, and a boy; that
defendant asked the prices, and plaintiff replied, $130 for
the old cook, $90 for the girl, and $50 for the boy; that
defendant said, as his family was small, he thought he could
do with the girl, and would take her and the boy at the
prices named; that after this, but before the making and
delivery of the notes for the hire, and before the delivery
of the negroes, defendant asked plaintiff why he hired his
negroes in the city rather than the country, and plaintiff
replied, because he could get better prices in the city, and
because it was healthier in the city than in the country;
that the notes for the hire, one for $50, and two for $45
each, were then executed and delivered by defendant to
plaintiff, and the latter then delivered the negroes to
defendant.

"There was proof, also, that in March or April, 1844,

defendant hired the girl Adeline to one Hughes, who lived in the country, about three miles from the city of Montgomery, and whose plantation lay upon the Alabama river; that Hughes, while she was in his possession, worked her in the field with his other field-negroes; and that in July or August of that year she died. The testimony tended to show that she was sick but about three days. Moore, the overseer of Hughes that year, was called as a witness by plaintiff, and testified, that on Sunday, the last of July, or first of August, the girl had a chill and fever, and told him she had been similarly attacked the day before; that he gave her calomel on Sunday night, which operated well, and castor oil on Monday morning, which also operated well; that she appeared much better about dinner-time on that day, and asked for something to eat, which was given to her; that on Monday night, about dark, she was much worse, and complained of pain in her side; that he took about a half-pint of blood from her, and put a mustard-plaster on her side and stomach, and on her wrists; that she seemed relieved of pain in a short time after the bleeding and application of the mustard-plaster, and went to sleep; that he remained with her until eleven o'clock at night, and she still slept; that he left a negro man and woman to sit up with her, with directions to call him if any change occurred; that one of the negroes called him about day-light the next morning, and said that Adeline was worse; that he then went out, and found her dying, and she soon afterwards died. Moore testified, also, that Hughes was aware of the girl's sickness, and of the manner of his treatment, at the time, and permitted it; that the girl was a good field-hand; that he was no physician, and did not know what disease Adeline had, unless it was chills and fever; that he had been overseer-ing for fifteen years, and had been in the habit of administering medicines to sick slaves on the places where he was living. Defendant proposed to prove by Moore, in this connection, that prudent planters generally did not call in a physician to attend their negroes, unless in dangerous cases; but that they allowed and permitted their over-

seers to administer medicine to slaves, when sick, except in dangerous cases, when physicians were called in. Plaintiff objected to this testimony, and the court sustained the objection; to which defendant excepted.

"It was in evidence, also, that several physicians resided in the city of Montgomery; that the neighborhood of Hughes' plantation was more sickly than the city of Montgomery, though it had been more healthy than the city a year or so previously; and that Mrs. Linn, a witness for plaintiff, was an old lady, had been several times married, and was the mother of children; but there was no proof of her being a physician or midwife. Dr. Ames, a practicing physician, who had heard the testimony of Moore and Mrs. Linn, was introduced as a witness by plaintiff, and testified, that he was not able, from the statements of Moore, to form an opinion of what the disease was, as no sufficient indications or symptoms were given by Moore; that he could not form an opinion from the united declarations of Moore and Mrs. Linn, because of their contradictions as to the nature and symptoms of the disease; and that he could not, for this reason, express an opinion as to whether Moore's treatment was proper or improper. Moore and Mrs. Linn were the only witnesses who testified as to the nature of the disease and its treatment. Plaintiff asked Dr. Ames, whether, in his opinion, from the condition of the girl as described by Moore and Mrs. Linn, the attention of a physician was necessary. The defendant objected to this question, but the court overruled the objection, and defendant excepted. Dr. Ames said, in his opinion, from the statements of Moore and Mrs. Linn as to her condition, the girl needed the attention of a physician. The evidence showed that no physician was sent for or called in to attend her. There was evidence that Mrs. Linn did not see Adeline while sick, and was not at Hughes' house while she was sick, but was there, and saw a girl of Hughes', named Sarah, while sick, who was about the same size, age, and color of Adeline; and there was evidence, also, other than her own, that she was intimate with Hughes' fam-

ily, knew his negroes, and knew Adeline, and was there at the time she was sick.

"Evidence was introduced by defendant, tending to show that, after the death of Adeline, plaintiff was informed of it, and of her having died at Hughes'; that after this information, plaintiff sold defendant's notes, given for the hire of both negroes, to one Noble, at a rate of discount usually given for good notes; that the notes were paid by defendant to Noble, about the time they became due, without any deduction from them. But there was no evidence of any information received by plaintiff, of the hiring to Hughes, the working of the negro in the field, or of her treatment, before he sold the notes, other than is mentioned above; but there was evidence that he was twice in Montgomery, after the negroes were hired to Hughes, and before he sold the notes to Noble, and was in the city two or three days; also, that both slaves were hired to Hughes at the same time."

Plaintiff then offered in evidence two depositions of Mrs. Linn, the first of which was as follows:

"I know the parties. I saw a girl named Adeline, belonging to plaintiff, at Andrew B. Hughes', but do not know of her ever being hired to B. N. Wilkinson. I saw said girl at Hughes' house, in 1844, in the month of August, I think. I do not know how she came into Hughes' possession, or from whom he got her. Said girl was very sick when I saw her, which was in the afternoon; and on my visiting the house the following day, I was informed by the overseer, Mr. Moore, that she was dead. She had a violent fever when I saw her, *and was in the family way, and told me that she was in great pain.* I only saw her that one time. I have no knowledge how she was treated, nor what attention she received, nor what physician attended her. *I told Mr. Hughes that the girl was very sick.* The overseer said, he had given her a large dose of calomel, and it operated very well. The negro girl told me, that no physician attended on her. She had a violent fever, and complained very much of her head. *She was also, in my judgment, pregnant at the time.* I cannot say positively, but expect, that she died of the disease she

was suffering under when I saw her. Mr. Hughes was very sick at the time I saw the girl. I never saw any physician there. Mr. Hughes told me, that Dr. Ames attended on him. This was in the year 1844, and, I believe, in the month of August; but I cannot state what day of the month it was. Mr. Hughes told me, that the physician came once in two or three days, and then generally when sent for. I do not know that the physician was called to see Adeline, nor that he saw her or prescribed for her, nor how long he had been attending there before she died. I heard that Mr. Hughes was sick before I went there. I do not know that the physician was at the house the day Adeline died. I did not see him there at all when I was there. *I should say that the girl's disease, at the time I saw her, was such as required the attention of a physician. I thought she needed medical aid, and considered her situation dangerous, so far as I could judge women's complaints.* I did not see any attention paid to her. She was lying on the kitchen-floor, with nothing under her. Mr. Hughes was very sick at the time, and unable to go about."

The second deposition of this witness was follows: "*According to my judgment, Adeline had a violent fever,* and complained of pain in her head, and that she had pains in the lower part of her stomach. *My reasons for saying that she was pregnant, are, because she told me so, and I also judged that she was in that way from her size; no examination was made in my presence. From the situation in which I saw the girl, having a high fever, and appearing to be in great pain, and from the experience I have had in similar cases, having seen many women in pregnancy and diseases incident thereto, I formed the opinion of the case which I expressed on my former examination.* I saw Mr. Moore, the overseer, at the time I saw the girl; but did not see any attention given to the girl, nor any of the negroes waiting on her. I do not know whether any of the negroes were permitted or prevented waiting on her. Not knowing Mr. Moore, I cannot say whether he was drunk or sober. While there, I saw him frequently drinking liquor, which I believe was

37

whiskey. I did not see anything uncivil or improper in him; his conduct and behavior were not out of the way. I did not say anything to him about Adeline, until after her death. I saw Adeline twice during the same evening while I was there; went to see her at the request of Mr. Hughes; saw her but a few minutes each time, examined her, and asked her some questions. I do not recollect to have seen any person there, except Mr. Hughes and Mr. Moore."

To each one of the italicized sentences in these depositions the defendant objected, and moved the court to exclude the same from the jury, on the ground that they were the expression of mere opinions by the witness, and that there was no proof which authorized the admission of her opinions as evidence; and to the overruling of these several objections exceptions were reserved.

"The defendant offered to show, by the depositions of two female witnesses, that said girl Adeline, before and after she was hired to defendant, was not a cook, washer, and ironer"; and reserved an exception to the exclusion of this evidence.

"Upon these facts, the court charged the jury, that if they found from the evidence that the attention of a physician was necessary to the girl Adeline in her sickness; that no physician was called to attend her; and that one could have been procured in reasonable time and distance,—then the burden of proof was on the defendant, to show that proper medical treatment and attention was given to her; and that, if defendant had not shown such proper medical treatment and attention, plaintiff was entitled to a verdict for the loss of said slave.

"The defendant excepted to this charge, and requested the court to instruct the jury, that if they believed the terms of the contract were truly stated by the witness Moseley; and that the defendant, before the expiration of the term of hiring, hired said Adeline to Hughes, where she was worked in the field, and died; and that plaintiff afterwards, before the institution of this suit, with full knowledge of all the facts and circumstances concerning her hiring to Hughes, her sickness, treatment and death,

disposed of the notes given for the hire, for a valuable consideration, without any deduction on account of the death of said Adeline before the expiration of the term of hiring; and that defendant afterwards, before the institution of this suit, paid off said notes to Noble, without any deduction therefrom,—then plaintiff could not recover under the second count in the declaration."

The defendant also requested the same charge as to each of the other counts. The court gave the charge as to the third count, but refused to give it as to either of the other counts; and to each refusal an exception was reserved.

The rulings of the court on the pleadings, and its other rulings during the trial, as above stated, are now assigned as error.

THOS. WILLLIAMS, and WATTS, JUDGE & JACKSON, for appellant.

ELMORE & YANCEY, and JAS. E. BELSER, contra.

STONE, J.—The question of a misjoinder of counts has been frequently considered in this court, and it has been invariably held, that the defect can be taken advantage of on general demurer.—Copeland v. Flowers, 21 Ala. 472; Sheppard v. Furniss, 19 Ala. 760; Jefford v. Ringgold, 6 Ala. 544.

2. The power of the court to permit an amendment, after a demurrer for misjoinder of counts has been sustained, seems not to have been heretofore considered in this court. The English authorities are not entirely in harmony on the question of the effect of such misjoinder. See Jennings v. Newman, 4 T. R. 347; 1 Chitty's Pl. 6 Amer. ed., 236. Neither is there uniformity in the American decisions.—Cooper v. Bissell, 16 Johns. 146; Pell v. Lovett, 19 Wend. 546; S. C., 22 Wend 369; Governor v. Evans, 1 Pike, 349. However the rule may exist in other States, we are satisfied that, under our statute of 1824, (Clay's Digest, p. 334, § 119,) the court was authorized to grant the amendment on terms.

3. Case and trover may be joined in the same action.

See 1 Chitty's Pl. 240 ; Horsley v. Branch, 1 Humph. 199. Hence the demurrer to the declaration was rightly overruled.

4. The 1st, 2d, 5th and 6th pleas, each assume to answer the whole declaration. They do not negative the negligence charged in the first count; and for that defect, the demurrer to them was rightly sustained.

5. The 3d plea was frivolous, and the court did right in striking it out. *Non assumpsit* is no defense to an action in tort.

6. Separate motions were made to exclude several portions of the testimony of Mrs. Linn. The testimony which the defendant sought to exclude was mostly of one and the same character. It consisted of expressions by the witness that the slave *was sick,—had fever,—was pregnant,* &c. The argument is, that inasmuch as the witness is not shown to be a physician or midwife, she cannot be heard to give opinions. Neither one of these inquiries involves, necessarily, a knowledge of the science of medicine. Most persons, of ordinary experience, are able to answer them. They are usually determinable by the services, and we think the motion to exclude them was correctly overruled.—Milton v. Rowland, 11 Ala. 732.

7. The opinion of this witness, that the slave needed the services of a physician, rests on a different principle. The opinion of the witness, on this point, had been directly called for in the interrogatories; and those interrogatories had been crossed, without pointing out this or any other objection. It was too late to move its exclusion at the trial. Parties cannot in this way speculate on the chances of a favorable answer, and, if unfavorable, then have the testimony excluded.—Francis v. Ocean Ins. Co., 6 Cow. 404; Washington v. Cole, 6 Ala. 214.

8. The statements of the slave, made to Mrs. Linn, that she (the slave) was pregnant, &c., were admissible under the authority of Eckles & Brown v. Bates, 26 Ala. 655 ; and Rowland v. Walker, 18 Ala. 749.

9. The objection to the question propounded to Dr. Ames should have been sustained. It did not call for his opinion, based on a state of facts either known to the

witness, or stated *hypothetically* in the inquiry. He was asked to give his opinion of the "condition of the girl, as described by the witnesses Moore and Mrs. Linn." The bill of exceptions informs us, that the testimony of these witnesses was in conflict. Before Dr. Ames could give his opinion, as called for by this question, he must first determine *the condition* of the slave. To do this, he was required to pass on the credibility of the witnesses; to weigh, reconcile, and construe their evidence. All this was a clear invasion of the province of the jury.—1 Greenl. Ev. § 440, and authorities cited. But, if there had been no conflict in the testimony, the question would have been equally inadmissible. If it was desirable to obtain Dr. Ames' opinion of a case of which he had no personal knowledge, the proper question would be, to ask his opinion on a supposed or hypothetical state of facts. The question might be varied, either in the direct or cross examination, so as to obtain his opinion on each phase of the case which any part of the testimony tended to establish. This form of question will leave with the jury the undisturbed right of weighing the evidence, and determining what it proves.—Sills v. Brown, 9 Car. & P. 601.

10. The bill of exceptions informs us, that the defendant offered to prove that the slave Adeline was not a cook, washer and ironer; that this testimony on the motion of plaintiff was rejected, and defendant excepted. If this testimony was offered as an excuse or reason for the act of Wilkinson in sub-hiring the slave, it was clearly inadmissible under any circumstances. If, in letting Adeline to hire, Moseley had represented her as a cook, washer and ironer, when she was not, the hirer, on discovering the representation to be false, would have been authorized to return the slave to him, and thus put an end to the contract. Such misrepresentation, however, would not have authorized him to sub-let her to another and different service. This remark must, of course, be confined to cases in which, by the terms of the contract of hiring, the right to employ the slave is restricted either as to place or service.—Seay v. Marks, 23 Ala. 532.

11. But the pertinency of the question may be consid-

ered in another point of view; namely, as affecting the value of the slave. These qualifications would enhance the market value of the slave, and, of course, would increase the plaintiff's recovery. The absence of them would, for the same reason, prevent such increased recovery. Whether the plaintiff had offered any proof, tending to show that she was a cook, washer and ironer; or whether these qualities were estimated in fixing her value, the record does not inform us. It is my individual opinion, that, under the rule which requires us to indulge all reasonable intendments in support of the ruling of the primary court, we ought to intend that no such testimony had been given, and that no such claim was set up.—See School Commissioners v. Godwin, at the January term, 1857, and authorities cited.

Another answer may be made to this assignment of error. The offer seems to have been one and indivisible, to prove that Adeline was not a cook, washer and ironer. Although the declaration avers, that under the contract of hiring, Wilkinson was to keep the slave in Montgomery, and employ her as a cook; and although the witness swears that, at the time of the contract, plaintiff represented that Adeline had cooked two years in the country, there is nothing in the record which tends, in the slightest degree, to show any claim or pretense that she was either a washer or ironer. According to my view, the offer being general to introduce a mass of evidence, a part of which was illegal, the court was not bound to separate the legal from the illegal, but was authorized to reject the whole.—19 Ala. 353; 20 Ala. 392; Ib. 828. Judge Walker, however, thinks the testimony should have been received, as furnishing a predicate for fixing the value of the slave. The difference between us cannot work any inconvenience in practice; and on another trial, the course of the examination will determine the materiality of the evidence, no matter which course be pursued.

12. We think the witness Moore should have been permitted to testify, "that prudent planters generally did not call a physician to attend their negroes, unless in dangerous cases; but that they allowed and permitted

their overseers to administer medicines to slaves when sick, except in dangerous cases, when physicians were called in." If such be the rule with prudent planters, we know of no other means of proving it. Of course, it will be for the jury to determine, from all the testimony adduced, whether any, and what general regulation on this subject, prevails on the plantations; and whether, under that regulation, a physician should have been called to this slave.

13. In the case of the Ala. & Tenn. Rivers R. R. Co. v. Burke, 27 Ala. 535, this court held, on a case strikingly like the present, that a hirer is bound to the observance of only that "degree of care used by the generality of mankind in relation to their own slaves." If this was a plain case, and the generality of mankind, either themselves or by their overseers, administered medicines in such cases, then, in the absence of an express contract requiring greater care, the defendant was not required to send for a physician.

We are sensible that the rule thus announced by us is not free from difficulty. Sometimes a case which, to ordinary observers, would appear plain and simple, is in fact of most complicated character. Sometimes the treatment, even if the case be plain and simple, is inappropriate in the extreme. Even physicians of the most extensive learning and experience frequently differ in their treatment of diseases of the same type; and perhaps the *generality of mankind*, not of that profession, in treating disease, would differ yet more widely. We apprehend that no certain and fixed rule could be laid down, for the treatment of all diseases, even of the same name. We further suppose that the multitude of persons, who make up what is called the "generality of mankind," have almost as many theories for administering medicine, as there are individuals composing that multitude.

The right to administer medicine, in a plain case, must carry with it, to some extent, the right to determine when a case is, and when it is not, a plain one. This right is not, however, without its limitation. The planter or his overseer, who assumes to administer medicine in a plain

case, must bring to the service such reasonable knowledge and experience of the diseases he treats, as are possessed by the generality of mankind. If, possessing this knowledge and experience, the disease appear to be a plain and simple one, and he treat it, we think he would not be liable, even if he erred; provided such custom exist as was attempted to be proved in this case. To hold otherwise, would be to require of hirers of slaves greater care and diligence than persons generally bestow on their own property, or even their wives and children.

On the other hand, if to one of reasonable knowledge and experience, the disease appear to be complicated and difficult; or if the treatment so administered by the hirer or his overseer be palpably improper in the case as it appears to be, the custom attempted to be set up would not afford a defense. If injury result from such misdirected treatment, the hirer would be clearly liable. While we require of hirers only that degree of care bestowed by the generality of mankind upon their own property, we are unwilling to expose the property hired to stupid and reckless empiricism.—Swigert v. Graham, 7 B. Monroe, 661; Harrison v. Snyder, 3 Barb. Sup. Ct. 380.

We do not think the case of Deane v. Keate, 3 Camp. 4, is in conflict with this view. In that case, there was no proof of any custom of the generality of mankind on the particular subject.—See Edw. on Bailments, 320.

14. The second count in the declaration, though special in form, is nothing more or less than a count in trover. No negligence, or want of care, is charged in it. It avers only a breach of duty, in sending the slave to the country, when, by the alleged terms of the contract, the hirer was bound to keep her in the city. True, the count avers the loss of the slave, as a consequence of her being sent to the country; but this is the statement of a conclusion. No act, or omission of duty, is charged in this count, which, *per se*, could have caused the death of the slave. Hence we feel authorized to declare that it charges no negligence.

15. This, then, being a count in trover, the same defense which will defeat a recovery under the third count,

must defeat a recovery under the second. The charge asked should have been given in reference to this count, as well as the third.—Moseley v. Wilkinson, 26 Ala. 411–16, and authorities cited; Edw. on Bailments, 313; Hooks v. Smith, 18 Ala. 338.

16. The charge given and excepted to is calculated to mislead the jury. It leaves out of view a very important inquiry, and hinges the defendant's liability on an erroneous principle. The *gravamen* of the first count is, 1st, that the slave needed the services of a physician; 2d, that it was the duty of the defendant to supply a physician; 3d, that he failed to do so; and, 4th, that in consequence of such failure, the slave was lost to plaintiff. Each of these propositions should have been submitted to the jury for decision; and the existence of all was necessary to a recovery under the first count. The defendant was not liable, under that count, unless the jury were satisfied, under all the proof, that the death "was the result of the violation of duty on the part of defendant."—Wilkinson v. Moseley, 18 Ala. 288–293; Edw. on Bailments, 320.

For the errors above pointed out, the judgment of the circuit court is reversed, and the cause remanded.

RICE, C. J., not sitting.