## COMMONWEALTH *vs.* WILLIAM E. STURTIVANT.

Plymouth.   Nov. 23, 1874. — Jan. 23, 1875.   AMES & DEVENS, JJ.,
absent.

On the trial of an indictment for the murder of A., there was evidence that two
other persons were killed at the same time and by the same weapon. *Held,* that
the government might lay before the jury the whole transaction of which the
murder of A. was a part; and that a doctor might testify as to the autopsy of the
body of one of the other persons.

Common observers, having special opportunity for observation, may testify to their
opinions as conclusions of fact, although they are not experts, if the subject mat-
ter to which the testimony relates cannot be reproduced or described to the jury
precisely as it appeared to the witness at the time, and the facts, upon which the
witness is called to express his opinion, are such as men in general are capable of
comprehending and understanding.

Whether a witness, not an expert, is qualified to express his opinion as a conclu-
sion of fact, is to be decided by the judge presiding at the trial; and his finding is
not open to revision in this court, unless, upon a report of all the evidence, it is
shown to be without foundation, or is based on some erroneous application of legal
principles.

On the trial of an indictment for murder, a witness familiar with blood, who had
examined, with a lens, a blood-stain on a coat, when it was fresh, and who testified
to its appearance at the time he examined it, and that it was not in the same con-
dition at the trial, was permitted to testify that its appearance when he examined
it indicated the direction from which it came, and that it came from below up-
ward, although he had never experimented with blood or other fluid in this re-
spect. *Held,* that the admission of the testimony afforded no ground of excep-
tion.

At the trial of an indictment for murder, a witness who, soon after the homicide, had
taken a pair of shoes from the defendant's house, one of which, as the govern-
ment contended, fitted a track supposed to have been made by the murderer, was
permitted to testify that the shoes appeared as if they had recently been washed.
*Held,* that the admission of this testimony afforded no ground of exception.

On the trial of an indictment for murder, if the government contends that the mur-
dered man had a certain sum of money in his possession, and that the taking o
this was the motive of the murder, the defendant may show that no money was
missing; but information obtained by the administrator of the deceased, upon
inquiry by him, as to what moneys the deceased had received, and what he had
paid out prior to his death, is hearsay evidence and inadmissible.

A prisoner, when arrested, was told by the officer that he was not obliged to answer
any questions put to him; a few days later he was questioned by the officer, and
made statements prejudicial to himself. No inducement or influence on the part
of the officer was shown. *Held,* that the statements were admissible in evidence, al-
though the prisoner had no counsel at the time he made them.

A man arrested on a charge of murder had about $335 in his possession, which he
attempted to conceal from the officer making the arrest. The government con-
tended that this money was stolen from the murdered man. The defendant offered

to show that some months before the murder the sum of $200 was stolen from a person who charged the prisoner with the larceny, and that he did not deny the charge. *Held,* that the evidence was inadmissible.

On the trial of an indictment for murder, there was evidence that scrip of a particular issue, not then in circulation, was found the day after the murder in the house of the murdered man, and that the prisoner the same day passed similar scrip. The witness who found the scrip was asked to describe it. This was objected to on the ground that the scrip should be produced. The government stated that the scrip would be produced. *Held,* that the witness was rightly allowed to describe it for the purpose of identifying the scrip when produced.

Books on medical jurisprudence cannot be read by a witness to the jury, although the witness is an expert and concurs in the views therein expressed.

An exception to the admission of evidence, on the trial of an indictment for murder, stated only that the government offered to show by a witness, who had chopped in the woods with the defendant, that he used an axe with the right hand forward; and that the testimony was admitted, subject to the defendant's exception. *Held,* that as it did not appear how this evidence applied to the case, or that the defendant was injured by its admission, it afforded him no ground of exception.

INDICTMENT for the murder of Simeon Sturtivant, at Halifax, in the county of Plymouth, on February 15, 1874. Trial before *Wells* and *Ames,* JJ., who allowed a bill of exceptions in substance as follows :

1. There was evidence tending to show that Simeon Sturtivant and Mary Buckley, his housekeeper, were last seen alive about half past six o'clock on Sunday evening, February 15, 1874, and that Thomas Sturtivant was last seen alive about half past four o'clock on the afternoon of the same day ; that about half past seven o'clock on the morning of the 16th, Mary Buckley was found lying dead in a field about thirty-five rods from the dwelling-house of the Sturtivants, and soon afterwards the dead body of Thomas was found lying in one room of the house, and that of Simeon in another room ; that between these rooms was another large room, all the doors of which were closed.

The only evidence tending to show who was the murderer of either of these persons was circumstantial. The government contended that the evidence tended to show that the three persons were killed by the same person, with the same weapon, at the same time. Two other indictments against the defendant had been found, and were pending in this court, for the murder of Thomas Sturtivant and Mary Buckley ; but the defendant had not been arraigned upon these indictments at the time of the trial although he was under arrest for the murder of all ; and the de-

fendant had offered to the government to go to trial upon all the indictments at the present term, and at one and the same time, which offer was declined. The government offered the testimony of a physician who had made an autopsy at the same time of the three bodies. The defendant objected to the autopsy of Mary Buckley, but it was admitted by the court. The testimony of the physician tended to show that the wounds were caused by a similar instrument, some blunt instrument.

2. A chemist having stated that he was accustomed to make chemical and microscopic examination of blood and blood-stains, for the purpose of determining whether they were human blood or the blood of other animals, was admitted as a witness for the government, and testified in regard to the tests which he had applied to certain stains upon articles of clothing belonging to the defendant. He was then asked to give an opinion as to the direction from which a certain stain upon the defendant's overcoat had come. The defendant's counsel objected, contending that the limit to which the witness could go was a full description of the stain as it appeared under the microscope or otherwise and illustrations before the jury, (which the witness made.) The objection was overruled, and the witness stated that the blood came from below upward. It was not shown that he had made or witnessed any experiments with blood or other fluids in regard to this matter. The examination of the witness and the rulings of the court upon this point were as follows :

*Qu.* " I wish to inquire what the stains upon the coat would indicate as to the direction from which the blood came ? " The defendant's counsel objected that this was not chemistry or any other branch of science.

*Wells*, J. " Is the coat in the same condition now as then in that respect ? Did it show anything then that it does not show now ? "

*Ans.* " It did. The natural rubbing from being handled has removed a portion. It could only be noticed, also, by the use of a lens."

*Qu.* " The natural rubbing of the coat has partially obliterated the blood ? "

*Ans.* " It has obliterated a portion of it; it can't be seen as distinctly."

*Wells,* J. " I think your first inquiry would be, whether there was anything discovered that indicated anything of that sort."

*Qu.* " At the time you made your first examination, was there anything discoverable that indicated the direction from which the stains had come that you found upon the coat ? "

*Ans.* " Yes, sir."

*Qu.* " What ? "

*Ans.* " The appearance of the stains."

*Qu.* " Will you tell us what direction they had come from ? "

*Defendant's counsel.* " So far as the stains are concerned that are upon the coat, the jury can judge as well as he can."

*Wells,* J. " I think the witness can describe what it was that he saw that indicated the direction, and show what it was, rather than to give a general opinion as to what the direction was."

*Defendant's counsel.* " I wish to reserve an exception, so far as the stains that are now upon the coat are concerned, and which the witness says are the same now that they were then, excepting the change resulting from the natural handling of the coat."

*Wells,* J. " I understand, also, that he says that there were indications then that are not apparent now ; that he examined it with a lens, and that that aided his examination. It is in that view that he is allowed to describe what the indications were which indicated the direction."

*Defendant's counsel.* " What is not there now, we do not ob ject to the witness describing ; but so far as anything now visible, indicating in which direction the blood came, is concerned, we ob- ject to that. We think the distinction should be observed by the witness ; and unless your Honors are of a different opinion, we ask that he may be confined to that."

*Wells,* J. " We think he may give the whole description, as it was found."

*Ans.* " It is an oval stain between one eighth and one fourth of an inch long, and one inch from the edge of the coat, on the right-hand side, front, and three and three fourths inches below the last button-hole, the bottom button-hole. The direction of the stain is diagonal. Using my own coat as an illustration, the stain lay in this direction, (illustrating.) The upper portion of the stain contained more blood than the lower, which it does not con- tain now, on account of its having been rubbed off."

*Qu.* " What does that indicate as to the direction ? "

*Defendant's counsel.* " One moment. If it is chemistry, we do not object ; if it is anything else, we do."

*Wells,* J. " I think if the witness explains the reasons at the same time that he gives the result, he may do so."

*Ans.* " If the force of a stream of fluid, whatever it may be, and especially blood, be from below upward, the heaviest portion of the drop will stop at the further end of the stain ; if from above downward, it will stop below."

*Defendant's counsel.* " That is pure opinion as to a matter of mechanics, not chemistry. Any butcher is just as good an expert on that as this witness."

*Wells,* J. " The evidence is admitted subject to exception."

*Ans.* " It can only be seen with a lens in a small stain."

*Qu.* " Now, you have described one, the direction of which was upward and diagonal. Is there any other ? "

*Ans.* " Not upon the coat."

3. A pair of shoes was taken from the defendant's house on the second day after the homicides, one of which, as the government contended, fitted a track supposed to have been made by the retreating murderer. No blood-stains were found upon the shoes. The witness who took them testified, under objection, that they appeared as if they had been wet, and partly, not quite dried, still moist a little ; should say they had been quite wet. The witness also stated that they looked as if they had been washed. The witness had been familiar with the cutting of leather and the making of shoes, and had worked at the business some fifteen years before, from the age of thirteen until he was twenty-one. The defendant did not object to testimony as to the condition of the shoes in respect to dampness, &c., but objected to the officer giving an opinion as to the condition in which the shoes had been before he saw them. It was in evidence that the prisoner denied having recently worn the shoes. The Attorney General argued to the jury that this statement was false, and that the shoes had been washed to remove the mud.

4. The government contended that between $300 and $400, in possession of the prisoner on the day of the arrest, was stolen by him from the Sturtivants, or from their dwelling-house, on the night of the homicides, and was evidence that he was the mur-

derer. The defendant offered to show by the administrator of Simeon and Thomas, that he had made careful investigation of their affairs, and found that all the money that could be traced to their possession had either been disposed of in their lifetime, or had been found in the house by the administrator after the homicides. Upon objection by the government the court excluded the testimony. The examination of the witness and the rulings of the court upon this point were as follows :

*Defendant's counsel.* " I will ask you whether you had in fact made endeavors to ascertain what moneys could be traced to the possession of the Sturtivants, and what money they had paid out."

*Attorney General.* " The duty of administrators has nothing to do with the case."

*Defendant's counsel.* " I want to know whether the fact is not ascertained that this theory of the government is not supported, and I wish to show that investigation has been made, and it has been shown that there was no such fact. They have not put in any refutation of it ; yet they have opened a line of testimony from which they propose to show that these people were in the habit of keeping money, and that this prisoner knew it, and that that was the motive for the attempt upon their lives ; and then they undertake to say that between $300 and $400 were stolen in that house by this party and taken away. We shall show the contrary of that. We shall show what was received and was accounted for. We shall be able to destroy, I think, the proposition that there was a large amount of money taken from that house."

*Wells*, J. " The court think that the fact cannot be established in that way."

*Defendant's counsel.* " I limit the offer to the precise point, that the investigation disclosed that there was not any such sum of money as is stated by the prosecution taken from that house ; that there has been a thorough investigation made of the business relations and money transactions of these parties for a considerable period prior to their death, and also an investigation as to what was the disposition they had made of their money, and upon that investigation there is not found that there was any such sum of money unaccounted for as is said to have been taken by the prisoner."

*Wells*, J. " It is the same proposition, I think. I think the amount of money that they may have had is not to be determined by information which the administrator may have obtained by inquiry or examination of the papers." The witness subsequently stated that he found no books of account belonging to either of the Sturtivants, and no savings bank books.

5. The government called a state constable as a witness, who testified that on February 22 he had an interview with the prisoner in the jail, in the presence of the jailer, and a person who had acted as aid of the constable in keeping the defendant under strict surveillance during the day of the arrest, and till the time when he was actually put under arrest, about eight o'clock in the evening. The government then proposed to show by this constable that, during this interview, in reply to questions of the constable, the defendant made certain statements prejudicial to himself. It appeared that at the time of the interview, the defendant had had no counsel, and was not informed that he need not answer, or in any way advised of his right to remain silent. The court admitted the testimony, overruling the defendant's objection thereto.

It was in evidence that when the defendant was arrested by the witness on February 17 he was notified of the fact, and told by the witness, that officers Pinkham and Philbrick, who were present, would question him, and that he would not be obliged to answer any question which they should put to him unless he saw fit; and that the witness then told Philbrick and Pinkham to question him. The witness stated that he did not caution the prisoner at the interview in the jail that he need not answer him, because he had already cautioned him two or three times before; and no inducement or influence on the part of the witness was shown.

6. There was evidence tending to show that on the day of the arrest, the defendant had about $335 in bills or greenbacks, two of which were of the denomination of $100 ; that the defendant attempted to conceal this money from the officers who had him under surveillance. The theory of the government was that this money was stolen by the defendant from the house of the Sturtivants on the night of the murder, and that the motive of the defendant in committing the murder was robbery. But no evidence

was offered by the government tending to show that there were ever any $100 bills in the possession of the Sturtivants, or that they had any bank bills or greenbacks on hand at the time of the murder, beyond the sum of $2900 to $3000, mostly bank bills, which was found in the house after the murder, except that $595 were paid to Thomas, January 16, 1874; and it was proved in defence that four days afterwards he lent $600, which had not been repaid at the time of his death. A state constable who was called as a witness by the government, having admitted on cross-examination that at the interview when he arrested the prisoner, he had urged him to confess a larceny of gold (about $200) from one White, the defendant called the latter to show that some months before the homicides such a sum of gold was stolen from him, and that he had had several interviews with the defendant before his arrest in this case, concerning the larceny, and had charged it upon the defendant, and that the defendant did not deny the charge. The counsel for the defendant contended that the evidence was competent to go to the jury, in reply to the theory of the government that $333, said to have been in his possession the day of his arrest, was stolen by him from the house of the brothers Sturtivant on the night of the murder. This was offered solely for the purpose of accounting in part for the possession of the money taken from the prisoner by the officers on February 17. The court excluded the evidence.

7. The government, in opening their case, had stated, as one of the grounds on which they relied, that they should prove that certain pieces of scrip were found in a bureau-drawer on the morning of the 16th, in the Sturtivant house, of a particular issue, which at the time of the murder was not in circulation; that an open and empty pocket-book lay in the same drawer, and that the defendant on the day after the murder passed pieces of scrip of the same issue to two persons. In putting in their evidence as to the scrip found in the drawer, they asked a witness who saw it to describe it. The defendant objected, contending that the scrip itself should be produced. The attorney general stated that the scrip would be produced by the witness, who had it in his possession, and the court admitted the evidence as the means by which it might be identified when produced, and to corroborate the other evidence as to the finding. The witness described

it as of an old issue, the issue of 1863, with a gold band about the centre, of the denomination of ten cents, one of twenty-five, clean and not worn. The defendant objected to the proof of the date and denomination. The court admitted it as a part of the description.

8. A witness, called by the defence as an expert on the subject of blood-stains, having said that in his opinion it was impossible to determine with certainty in the case of a stain that had been dried upon clothing seven days, whether it was human blood, was asked if he coincided with the views of Dr. Taylor, as expressed in Taylor's Medical Jurisprudence, which book was passed to the witness. The counsel then proposed that a certain paragraph upon that point from the book, with which the witness concurred in opinion, should be read to the jury by the witness ; but the court excluded it.

9. The government offered to show, by a witness who had chopped in the woods with the defendant, that he used an axe with his right hand forward. The testimony was admitted, subject to the defendant's objection.

The jury returned a verdict of guilty of murder in the first degree ; and the defendant alleged exceptions.

*B. W. Harris,* for the defendant, stated that, without waiving the exceptions taken by *J. B. Harris,* who was counsel for the defendant at the trial, and who had been prevented, by reason of sickness, from taking any part in the preparation for the hearing on the exceptions, he should confine his argument to two points.

1. The opinion of the chemist who testified from the appearance of the drop of blood, that it came from below upward, was incompetent evidence. The expert should have been limited to a statement of what he was, by his superior knowledge, better qualified to testify about than another, and concerning which the jury from that knowledge common to mankind which they were supposed to possess, would be unable to determine for themselves and without his aid. The case finds " that it was not shown that he had made or witnessed any experiments with blood or other fluids, in regard to this matter." He was, nevertheless, permitted to give his opinion that the drop of blood came from below upward, and thus to supply one of the necessities of the

government's case. He was also permitted to state, as a reason for his opinion, that " if the force of a stream of fluid, whatever it may be, and especially blood, be from below upward, the heaviest portion of the drop will stop at the further end of the stain; if from above downward, it will stop below." The witness had minutely described the shape of the stain, its position on the coat, that its direction was diagonal, and that the upper portion of it contained more blood than the lower. The jury, therefore, had all the facts, and it was for them to draw the inference from whence the blood came, for the witness had no more knowledge derived from experiment than they. It can be demonstrated that the theory of the witness was incorrect in point of fact: thus if ink from a pen be thrown upward upon a sheet of paper the larger part of the stain is at the bottom, and as soon as the force is exhausted the greater body of the fluid falls to the bottom. If a small drop of ink falls downwards on to the paper, the upper part of the stain is the largest, while the greater body of the fluid settles to the bottom. If a fluid be thrown upon cloth, the general result is the same. To enable a person to determine this question from reasoning alone, he must have a knowledge of the laws of gravity and of forces, and the laws of friction, of angles and absorption also play an important part. If the experiments just made merely satisfied the court that the testimony of the witness was incorrect in point of fact, there would be no ground for sustaining the exception; but they also show that to understand and form an intelligent and instructed judgment about such matters, and to explain them to the jury with the authority of an expert, requires a knowledge of the laws of forces and mechanics, derived from experiment and experience, rather than a knowledge of the laws of chemical analysis, and of the use of the microscope; and that the latter is not an equivalent for the former.

2. The evidence that the defendant in chopping wood used the axe with his right hand forward, was improperly admitted. It had no tendency to identify the defendant as the murderer, as the majority of people in the world may or do use an axe in the same manner. A woodman, without changing the tracks of his feet, cuts from the circumference to the centre of the tree, using the axe right hand forward, and then, almost unconsciously

to himself, changes hands and cuts from the circumference to the centre, or until the tree falls, left hand forward. Nor is it shown in this case that the defendant was left-handed, or that Simeon Sturtivant was killed by a blow right hand forward. He was killed upon his bed, by blows from a club, which fell diagonally across his face, ranging from the right of the lower part of the face upward in the direction of the left eye. It is apparent, then, that the murderer stood on the right hand side of the bed facing it. The blows might equally well have been inflicted with the right hand alone, with the left hand forward as with the right hand forward. And if the murderer stood a little nearer the foot of the bed the same blows could be inflicted from the left side of his body, by his left hand alone, or by the left hand forward or by the right hand forward. There are, therefore, six different ways in which the blows might have been given by any man who had two hands, and was at all skilful in the use of them. The testimony, therefore, had no tendency to show that the defendant committed the murder, or that he was better able or more competent physically to commit it than any other man ; and it should have been rejected.

3. The evidence admitted as to the drop of blood and the manner of using an axe was not immaterial. The government contended that it was material, and the court ruled it to be competent, and this court cannot say that it had no influence on the minds of the jury. *Jewett* v. *Draper*, 6 Allen, 434, 436. *Lyman* v. *State Insurance Co.* 14 Allen, 329, 335.

*C. R. Train*, Attorney General, (*W. G. Colburn*, Assistant Attorney General, with him,) for the Commonwealth.

ENDICOTT, J. 1. There was evidence tending to show that three persons, Simeon Sturtivant, Thomas Sturtivant and Mary Buckley, were killed at the same time, by the same weapon. The government had the right to lay before the jury the whole transaction of which the murder of Simeon Sturtivant was a part. For this purpose the testimony of the physician, as to the autopsy of Mary Buckley, was competent.

2. The principal exception is to the competency of the evidence in regard to the blood-stain. The question here is whether a witness, who is familiar with blood and has examined, with a lens, a blood-stain upon a coat, when it was fresh, can also tes-

tify that the appearance then indicated the direction from which it came, and that it came from below upward, although he has never experimented with blood or other fluid in this respect. The witness had previously testified to its appearance at the time he examined it, and to the fact that at the trial it was not in the same condition, some of the blood having been rubbed off.

The exception to the general rule that witnesses cannot give opinions, is not confined to the evidence of experts testifying on subjects requiring special knowledge, skill or learning; but includes the evidence of common observers, testifying to the results of their observation made at the time in regard to common appearances or facts, and a condition of things which cannot be reproduced and made palpable to a jury. Such evidence has been said to be competent from necessity, on the same ground as the testimony of experts, as the only method of proving certain facts essential to the proper administration of justice. Nor is it a mere opinion which is thus given by a witness, but a conclusion of fact to which his judgment, observation, and common knowledge has led him in regard to a subject matter which requires no special learning or experiment, but which is within the knowledge of men in general.

Every person is competent to express an opinion on a question of identity as applied to persons, things, animals or handwriting, and may give his judgment in regard to the size, color, weight of objects, and may estimate time and distances. He may state his opinion in regard to sounds, their character, from what they proceed, and the direction from which they seem to come. *State* v. *Shinborn*, 46 N. H. 497. The correspondence between boots and footprints is a matter requiring no peculiar knowledge, and to which any person can testify. *Commonwealth* v. *Pope*, 103 Mass. 440. So a person not an expert may give his opinion whether certain hairs are human hairs. *Commonwealth* v. *Dorsey*, 103 Mass. 412. And a witness may state what he understood by certain " expressions, gestures and intonations," and to whom they were applied; otherwise the jury could not fully understand their meaning. *Leonard* v. *Allen*, 11 Cush. 241.

In this connection may be noticed a large class of cases, where, from certain appearances more or less difficult to describe in words, witnesses have been permitted to state their conclusions in

relation to indications of disease or health, and the condition or qualities of animals or persons. As, when a witness testifies that a horse's foot appeared to be diseased, he states a matter of fact, open to the observation of common men. *Willis* v. *Quimby*, 31 N. H. 485. And it is proper for a witness to give his opinion that a horse appeared to be sulky and not frightened at the time of an accident ; *Whittier* v. *Franklin*, 46 N. H. 23 ; or he may testify as to the qualities and appearance of a horse. *State* v. *Avery*, 44 N. H. 392. In *Currier* v. *Boston & Maine Railroad*, 34 N. H. 498, it is said that the question whether there was hard pan in an excavation does not ask for an opinion, but seeks for facts within the knowledge of the witness, and of which the knowledge may be obtained by common observation. It is competent for a witness to testify to the condition of health of a person, and that he is ill or disabled, or has a fever, or is destitute and in need of relief ; *Parker* v. *Boston & Hingham Steamboat Co.* 109 Mass. 449 ; *Wilkinson* v. *Moseley*, 30 Ala. 562 ; *Barker* v. *Coleman*, 35 Ala. 221 ; *Autauga County* v. *Davis*, 32 Ala. 703 ; and one may testify that another acted as if she felt very sad. *Culver* v. *Dwight*, 6 Gray, 444. So those who have observed the relations and conduct of two persons to each other may testify whether, in their opinion, one was attached to the other. And in *M'Kee* v. *Nelson*, 4 Cowen, 355, the court say : " The opinion of witnesses on this subject must be derived from a series of instances passing under their observation, which yet they never could detail to a jury." See *Trelawney* v. *Colman*, 2 Stark. 191. A witness may also give his judgment whether a person was intoxicated at a given time ; *People* v. *Eastwood*, 4 Kernan, 562 ; or whether he noticed any change in the intelligence or understanding, or any want of coherence in the remarks of another. *Barker* v. *Comins*, 110 Mass. 477. *Nash* v. *Hunt*, 116 Mass. 237.

In *Steamboat Clipper* v. *Logan*, 18 Ohio, 375, it was held that a person who had been a captain and engineer of a steamboat, having examined a boat after injury by collision, may state his opinion as to the direction from which the boat was struck at the time of the collision. There was no evidence that the witness had any special knowledge in regard to collisions, through observation or experiment ; and the court does not rest the decision on the ground that the witness was an expert; but says there is " no

objection to calling these men experts, if the name will render their testimony more unexceptionable ; but it is not true as a legal proposition that no one but an expert can give an opinion to a jury.   From the necessity of the case, testimony must occasionally be a compound of fact and opinion." And the court say that they can give no better illustration of their meaning than by the use of the language in *M'Kee* v. *Nelson,* a portion of which is quoted above.

Where, immediately after the collision of two boats, a person looked at their condition, he was permitted to testify to the impression made upon his mind as to the position in which they came together. *Patrick* v. *The John Q. Adams,* 19 Misso. 73.

It would seem to be within the knowledge of men in general, when looking at the effects of a blow upon a solid body, to determine from the external marks and indications, if any exist, the direction from which it came. In the great majority of cases, these indications are distinct and plain, and to observe them is within the constant experience of men. Take the case of a heavy body striking on the ground. A falling shot or fragment of rock leaves a very different mark, according as it strikes the ground vertically or at an angle ; and if at an angle, the general direction from which it came would be apparent to the common eye. In like manner, a contusion on an upright surface might plainly indicate the direction of the blow. Suppose the panel of a carriage door is broken in by a collision ; different appearances would follow from a horizontal blow delivered at right angles, than from a blow from the front or rear, from above or below. Such appearances the common observer can detect, some more accurately and clearly than others, but it is presumed to be within the power of all ; and the opinion of an expert, who has experimented by blows on similar surfaces, and is learned in the law of forces, is not necessary or required. If the panel itself is introduced to the jury, they are competent and able to decide the question. If it cannot be, the witness who saw it may describe, as well as he can, what he saw, and state the conclusion he formed at the time.

It would also seem to be within the range of common knowledge to observe and understand those appearances, in marks or stains caused by blood or other fluids, which indicate the direction from which they came, if impelled by force.

No one would question the fact that water passing over the sur-face of ground may and does, according to its force, leave clear and decisive indications of the direction of its passage.   The dry bed of a mountain torrent, or the track of a freshet, clearly indi-cates the direction of the stream.   And it is the same when pro-pelled artificially by force, as from an engine.   When the force is not great enough to disturb or displace the surface of the soil, the direction may be clearly discernible, when fresh, by the char-acter of the marks, stains or moisture it leaves upon the ground. These may not all easily be described in words, but may convey a distinct and decided impression to the mind at the time.

A bucket of water thrown upon the ground, particularly if thrown with force, would leave indications of the direction from which it came, evident to the most casual observer.   These would be more apparent if it congealed upon falling, and so became fixed and easily traced.   So if a drop or small body of water or other fluid is thrown with force against a perpendicular surface, as against the side of a building, or against clothing upon the per-son in an upright position, indications of its direction would ap-pear.   Whether it is thrown fairly against the surface, or from above or below, or diagonally, it is common knowledge that it will leave different marks or traces of its progress and direction. These marks will be the more easily discerned if made by a fluid thicker than water, and will remain longer and be more conspicu-ous if it is such as to leave a stain, or if the surface is rough or uneven, so as to retard it or check it in its course.

There is no question of science or learning necessarily involved in the understanding of these indications ; if visible, they are easily understood.   The only question is, were the common indi-cations visible, from which direction may be inferred.   It may be difficult in a given case to distinguish them without the most careful observation ; but if seen by the witness, they may be testified to.   It may also be more difficult to detect them on an upright surface, but that goes to the degree or weight of the evi-dence, not to its competency.   *Fryer* v. *Gathercole*, 4 Exch. 262.

Blood is a fluid which coagulates and stiffens rapidly when ex-posed to the air, and might therefore more decidedly give indica-tions of its direction.   If such indications do appear, there would seem to be no objection that a witness acquainted with the pecul

iar properties of blood, as the common mind is acquainted with more familiar fluids, should testify to them without having actually seen or made experiments in regard to it.

The cases which have been cited are limited to those instances where common observers, having special opportunity for observation, but not experts having special learning, have been permitted to testify to their opinions, as conclusions of fact.

The competency of this evidence rests upon two necessary conditions : first, that the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time ; and second, that the facts upon which the witness is called to express his opinion, are such as men in general are capable of comprehending and understanding.

When these conditions have been complied with or fulfilled in a given case, the court must then pass upon the question, whether the witness had the opportunity and means of inquiry, and was careful and intelligent in his observation and examination. It is not the mere qualification of the witness but the extent and thoroughness of his examination into the specific facts to which the inquiry relates, and the general character of those facts, as affording to one, having his opportunity to judge, the requisite means to form an opinion.

The same rule applies to this class of testimony as to the testimony of experts, whether the expert is competent by his study or business, and whether he has qualified himself to testify, or had proper opportunity to examine, are preliminary questions for the court. So when witnesses to the value of land or property or handwriting are called, to which all men may testify, if they have information on the subject matter of inquiry, their qualification to give an opinion must be first decided by the court at the trial. In all these cases the element of fact is involved to be decided by the court, upon which the capacity to testify depends. And the decision at the trial, like all decisions of this character, is final and conclusive, unless upon a report of all the evidence it is shown to be without foundation, or is based on some erroneous application of legal principles. *Nunes* v. *Perry*, 113 Mass. , and cases cited. *Commonwealth* v. *Coe*, 115 Mass. 481. *Swan* v. *Middlesex*, 101 Mass. 173, 177.

In the case at bar the admission of the evidence by the court involved the decision : (1) that the stain was not in the same condition, and did not exhibit the same appearance at the trial as it did when examined by the witness, and cannot be reproduced to the jury : upon this as a matter of fact there is no question ; (2) that the stain might in itself furnish indications from what direction it came, capable of being observed by a witness, who though familiar with blood and its qualities, had not made or seen experiments made with it or other fluids in this respect ; and (3) that the witness had made that thorough, careful and intelligent observation of the appearances, which would entitle him to testify. We must take the decision of the court on this last point to be conclusive.

Whether the reasons the witness gave for his opinion of the direction of the stain were sound or unsound, does not affect the question of competency, and of course the defendant had full opportunity to test him by cross-examination, or to show by evidence or argument that his reasons were unsound.

We cannot say that such a witness, familiar with blood, its properties and appearance, with his opportunity to examine and the actual examination made by him, might not form and testify to a reliable opinion as to the direction in which the blood moved in making the elongated stain, although he had never made actual experiments of that kind ; and we see no ground for sustaining this exception to the admission of the evidence.

3. For the same reasons the testimony in regard to the shoes taken from the defendant's house soon after the homicides, was competent. The witness stated the result of his observation, made at the time, of appearances that could not be reproduced or accurately described in words to the jury ; and his testimony related to a subject matter within the common observation and experience of men.

4. The testimony of the administrator of Simeon Sturtivant, that he had made inquiries and could not discover that any sum of money belonging to Sturtivant was unaccounted for, was properly excluded. The fact that no money was missing was competent, and was not excluded by the court. But the information obtained by the administrator upon inquiry, was mere hearsay and therefore inadmissible to prove the fact sought to be established.

5. The confession of the defendant, made to the officer, was properly admitted. No inducement or influence of any kind appears to have been used to obtain the confession. It was voluntarily made after the defendant had been cautioned at a previous interview that he was not obliged to answer any questions.

6. The officers, upon arresting the defendant, found in his possession $333. To account for this in part, the defendant offered to prove that one White, some time before the homicide, accused him of stealing $200, and " that the defendant did not deny the charge." Giving the utmost effect to this evidence, it would amount to a declaration only by the defendant some time before the homicide, that he had in his possession two hundred dollars. Such a declaration is not admissible in his own favor.

7. The description given by the witness of the scrip which he found in the bureau drawer at the Sturtivant house was properly admitted. The scrip itself was afterward put in evidence, and this description was admissible for the purpose of identifying the scrip produced by the government, as the same seen by the witness in the bureau drawer. For this purpose it was clearly competent.

8. The refusal to allow a witness to read extracts from a work on medical jurisprudence, was in accordance with the well settled practice in this Commonwealth. *Washburn* v. *Cuddihy*, 8 Gray, 430. *Commonwealth* v. *Wilson*, 1 Gray, 337.

9. The remaining exception was to the evidence that the defendant in chopping wood used the axe with his right hand forward. It does not appear how this testimony applied to the case, and, therefore, the bill of exceptions fails to show that its admission was erroneous. If, as is to be presumed, it appeared in evidence that the fatal blows upon the deceased were inflicted by a weapon used with the right hand forward, it was competent to prove that the defendant so used his axe when chopping wood. It is like the ordinary case, where a blow is apparently inflicted by a left-handed person, it is competent to prove that the accused is left-handed. It does not prove that he struck the blow, but it is a circumstance pointing to him as belonging to a class by one of whom the blow was struck, and, in connection with other inculpating testimony, is competent.

*Exceptions overruled.*