[No. 2557.]

## FAYETTE MEYERS *v.* THE STATE.

1. PRACTICE—EVIDENCE.—In a trial for assault with intent to murder, it being proved that the witnesses were experienced in the use and handling of fire arms, it was not error to permit them to testify that they tested the condition of the gun of the defendant by putting their fingers in the muzzle, shortly after the alleged offense, and that, in their opinion, it had been recently discharged.
2. SAME.—It was competent for a State's witness to testify that, under the direction of the sheriff, he applied the boot taken from the foot of the defendant to tracks found near the place of the assault, and found them to correspond. Such evidence, though not sufficient of itself to sustain a conviction, is an item of circumstantial evidence, and may be considered as such.
3. CHARGE OF THE COURT—FACT CASE.—See evidence *held* sufficient to sustain a conviction for assault with intent to murder, and whereunder there was no occasion for the charge of the court to discriminate between express and implied malice, or to define implied malice, inasmuch as, if death had ensued, the offense could only have been murder in the first degree.

APPEAL from the District Court of Collin. Tried below before the Hon. R. Maltbie.

The conviction in this case was for an assault with intent to murder Harrison Lowery. The penalty imposed was a term of two years and three months in the penitentiary.

Harrison Lowery was the first witness presented by the prosecution. He testified, in substance, that he first saw the defendant on the day of the alleged assault, at about sundown,

near the corner of the graveyard, about a mile south of McKinney, in Collin county. At that time the defendant lived west of the witness's place, on Wilson creek. A colt of the witness had strayed, and the witness was looking for it when he encountered the defendant on the occasion referred to.

After the witness had passed him some ten or fifteen steps, the defendant called to him and said: "Stop, I want to talk to you about some old tales." He said that he intended to fill the witness full of buckshot, and would shoot him from the bush. The witness replied: "If I had anything against you, and could not say it to your face, I would say nothing about it." To this the defendant responded that there was Indian enough in him to waylay a person and shoot him from the bush. He proceeded with the witness until they had passed Smith's gin, a distance of about one-quarter of a mile, cursing him several times. Beyond Smith's gin, they met Durkee and drank with him. They traveled together two or three miles and separated, the defendant going towards home, and the witness continuing in search of his horse.

Within two or three miles the witness found and caught his colt, and started back home. He had reached a point just west of a bridge across a small branch, east and a few hundred yards distant from where Rogers lives, on the McDonald farm, when he was shot from ambush, the shot taking effect in his left side. The shooting took place some two hours after dark, and the witness saw no one at the time. One large tree stands on the right of the road in that vicinity, and two on the left.

After he was shot the witness traveled along the road for a distance of three-quarters of a mile to the house of a negro man named Granville Lively, and shortly Doctor Gibson arrived, dressed the wound, and cut one ball from the person of the witness, taking it from near the navel. The witness was removed to his home the same night. He lived then at the graveyard, about a mile south from McKinney. The witness was visited the same night by Doctor Abbott, who cut one ball from his thigh. The witness's name was Harris Lowery, but he was also known and called Harrison Lowery.

Cross-examined, the witness stated that the defendant said nothing to him at all as he passed the defendant at the southwest corner of the graveyard, but appeared to be examining a wagon. He first called to the witness after the latter had passed some ten or fifteen steps, and said that he wanted to talk about

some old tales. He did not say what the tales were, though the witness asked him. He declared at the time that he would shoot the witness. While the witness and the defendant were riding together, they rode for a part of the time in a lope, part of the time in a trot, and a part of the time in a walk. During much of the time, after passing Smith's gin, the witness and the defendant discussed horse-racing.

The defendant threatened the witness after they passed Smith's, but the witness did not remember the language used. It was three or four miles from the graveyard to the place where the witness and the defendant separated, and about six miles from where the witness found his colt to the place where he was shot. The witness rode in a lope after leaving the defendant, and returned in a fox-trot. Describing the location of the shooting, the witness testified as follows: "It is about two miles from where we separated to the place where I was shot, about a mile from where we separated to where the defendant lived, and about three miles from where I was shot to where the defendant lived. I was shot about two miles further on the road towards McKinney from where we separated. I did not see the defendant any more that day or night after we separated, and it was after sundown when we separated."

The witness further stated, on his cross-examination, that he and the defendant had not been on good terms for some time before this occurrence. He declared that he had never told any one that the defendant had stolen his pig. He denied that he had ever told Andy Lucas, or one else, that he had enemies in that neigborhood and feared that he would be waylaid and shot in the same manner that an old negro named Jake Cartwright was waylaid and shot. He did not make such a statement to Lucas or any one else, last summer at Smith's farm, or other place or time. Witness heard but one report of a gun at the time he was shot, and he was wounded in six different places. He was confined in bed for six weeks from the effects of his wound, and had not yet entirely recovered.

P. G. Marshall testified, for the State, that about the time crops were pitched, in the year 1882, he heard the defendant say, at the corner of the square in McKinney, that the negro Harris Lowery had accused him of stealing a hog, and that he, the defendant, did not know how he could rest under that imputation. That he had discussed the matter with Beck, and

believed that he would wind up his business affairs, kill the d—d son of a b—h Lowery, and leave the country.

Cross-examined, the witness stated that the defendant was drinking at the time of making these threats, which was several months before the shooting. The witness paid no attention to his threats, but laughed over the matter with some of his neighbors.

J. J. Russell testified, for the State, that he heard the defendant say that he would "stop Lowery's boat from running," or that he would "stop Lowery from traveling." The witness could not say which of these was the remark used. This occurred before the shooting, but after a difficulty which occurred between the parties three or four years before this trial.

On cross-examination, the witness could not state when or where or in the presence of whom this conversation occurred. "I don't know whether it was last year, the year before, or the year before, that I heard the defendant make the remarks about Lowery."

Richard Scalf testified, for the State, that during the previous spring or summer, he heard the defendant declare that he intended to kill Lowery for accusing him of stealing hogs. This occurred at the witness's mill.

Cross-examined, the witness stated that the defendant was always "blowing" around about what he intended to do to persons, and that he, witness, paid no attention to his threats.

Doctor W. C. McAulay, for the State, testified that he was at the house of D. L. Rogers, three miles south of McKinney, on the night that the negro Lowery was said to have been shot. On that night, not less than one nor more than two hours after dark, the witness heard the loud report of a gun from a southeast direction from Rogers's house. The witness had seen one of the balls taken from the person of Lowery, and would call it a slug.

D. L. Rogers was the next witness for the State. He testified that he lived about three miles south of McKinney. He remembered the night on which the negro Lowery is said to have been shot. Early on the next morning, which was October 29, Mr. Warden, the sheriff of Collin county, reached the house of the witness, and the two, Warden and the witness, went to the place where the shooting was said to have occurred, a point about three hundred yards southeast of the witness's house. This was a little after daylight. They found the tracks of a

horse and of a man south of the road, at a point where the road runs nearly east and west.  The horse track made by the right fore foot was wider than it was long, and was square in front, as though worn or broken off.  The horse was apparently unshod, and of about a medium size.  Of the several tracks of a man found, but one was perfectly clear and distinct, and that one was in a bank of loose dirt thrown up by the recent overflow of a branch, and was south of the bridge which spanned the branch.

The witness and Warden also found some bushes cut on the north side of the road.  When Warden arrived at the witness's that morning, he had with him a large bore double barreled shot gun.  The witness was somewhat experienced in the use of fire arms.  Applying that experience, he put his finger in the muzzle of the gun; he withdrew it, and found it wet and black, indicating that the gun had been recently discharged.  Objections to the reception of this evidence were overruled, and this action of the court below is one of the subjects considered in the opinion.

Proceeding in his testimony, the witness stated that, on the evening of the day after the shooting, he again went to the place where it was said to have occurred, with Warden, Beverly, the county attorney, Scott and Marion Warden.  Mr. Warden had with him a right foot boot, heavy half-soled, and the heel was creened or run down to the right.  Warden applied the boot to the distinct track described, and it was found to correspond.  The half-sole and heel of the boot itself exactly fitted the impression of the half-sole and heel of the track.  The witness then put the boot on his foot and made several tracks with it in the same soft dirt around the track found, and that track and those made by the witness with the boot corresponded exactly.  This evidence was admitted over the objection of the defendant.  The witness and his party at this time found some gun wadding of heavy, thick, dark brown wrapping paper.

Cross-examined, the witness could not say how long the gun had been discharged—whether one, two or three days.  Speaking of the distinct track in the soft dirt, the witness stated that the dirt had fallen in a little both at the heel and toe.  He could not tell whether the track was made with a sewed or pegged boot.  The ground adjacent was bushy and covered with old leaves.  The party made no other measurement of the track than by an application of the boot.

Williams Warden, sheriff of Collin county, testified, for the State, that just before day on the morning of October 29, 1882, he arrested the defendant in bed at his home in Collin county, Texas. He was assisted by his two deputies, Gabe Beck and Todd Warden. He made this arrest upon the information that Harrison Lowery had been shot. The witness sent the defendant to town in charge of Beck and Todd Warden. At the house of the defendant he found a large double barreled shot gun, with the left tube broken. The right hand barrel was loaded and was damp, and the wadding was found to be powder burned. The cap was not bright. The witness had had considerable experience in the use of fire arms, and was of opinion that this barrel had been recently discharged.

The witness further testified that he went to the house of D. L. Rogers, and with him went to a point on the road about one-fourth of a mile southeast of Rogers's house, where there is a small ravine spanned by a bridge. He had been previously told that this was the place where Lowery had been shot. There was a large Spanish oak tree about twenty feet south of the road, and a great deal of brush about the place. At this point, south of the road, they found the tracks of a man and a horse. The man's track was in a bank of dirt that had been washed up, and was the only distinct track of the kind found. It was made by a boot or shoe which was half-soled and run down at the right of the heel. At this time it was also found that several bushes around had been cut.

On the evening of the same day the witness, in company with Rogers, his brother Marion Warden, Scott and Beverly, went to the place again. The witness had taken the boot from the right foot of the defendant, and took it with him. It was half-soled, and was run down at the heel. He compared the boot to the track and found it to correspond exactly, the half-sole and heel fitting in the impression nicely. Rogers then put on the boot and made other tracks with it, and these tracks were found to correspond exactly with that originally found in the dirt bank. The horse track, which was made by an unshod animal, left the road just east of the bridge, and went out into the bushes. From the brush it went into the road in a southeast direction. Gun wadding of heavy dark brown wrapping paper was also found at the place of the alleged shooting.

The witness further testified that, on the Monday following the shooting, he and W. S. Cloyd extracted the load from the

gun he had taken from the defendant's house, and found it to be of buckshot, some rough and some round. On the evening before the shooting, the defendant was in the office of the witness, and while there made some remarks about the negro Harris Lowery, saying, in effect, that he would see Lowery later.

On his cross-examination, this witness testified that there was a difference between the wadding found at the place of the shooting, and that found in the gun. That found at the place of the shooting was of a different shade of color, was darker, than that found in the gun. There were a great many leaves on the ground about the place where the shooting is alleged to have occurred. When the defendant was in the office of the witness the evening before the shooting, talking about Lowery, he seemed to be "blowing" or "blustering," and the witness paid no attention to him. Returning to the wadding, the witness stated that both the wadding found on the ground and that found in the gun was of wrapping paper of the same character, except that the wadding found in the gun was of lighter color than the other. This last was wet with burned powder, and had the appearance of having been rammed down into the gun immediately after it was fired.

Marion Warden testified, for the State, that he was at the alleged place of shooting on the evening after the night it was said to have occurred, and saw a man's track in a bank, and also about the place the track of a horse. The witness did not pay minute attention to the man's track, but observed that the horse's track went into the brush on the east side of the little bridge, and came out of it into the road on the same side of the bridge, and led off in a southeasterly direction. The defendant at that time lived in that direction from the place of shooting, some two and a half or three miles distant. The track was made by an unshod, medium sized horse. The hoof of the right fore foot appeared to have been broken off, and made the track present a square appearance. The track of the left fore foot of the horse presented the peculiarity of appearing wider than long; seemingly a portion of the hoof near the corner had been broken off.

On the Sunday morning following, the witness saw the track of a horse about one and a half or two miles east of the place of the shooting, on the east bank of Wilson's creek. This track was both going and coming from the direction of the defendant's residence. The witness traced it to within a quarter of a mile

of the defendant's residence. It followed the direction of and along an old road in the bottom which was not much used, and which was overlapped by bois d'arc and other bushes. This track was similar in appearance to the track the witness saw at the place of the shooting.

On his cross-examination, the witness stated that he testified in a former trial of this case, about two weeks prior to the present trial, and then testified that the horse track he found at the place of the shooting and the one he saw on Wilson's creek were made by the same horse, to the best of his knowledge, and that he was as positive of that fact as he was positive of anything to which he testified. He now averred that the tracks were similar. He said nothing on the former trial about the peculiarity of the track found at the place of the shooting, because he was asked nothing about it. For the same reason he said nothing about having seen a similar track on Wilson creek when he was examined at the preliminary trial.

G. A. Beck testified, for the State, that he saw two fresh scratches on the defendant's face after his arrest, one on his cheek and one about his eye. He also had some blood about his eyes. Cross-examined, the witness said: "It is somewhat bushy in the defendant's neighborhood. We came to town with the defendant after his arrest early in the morning. The scratches looked a little bloody, like his face had not been washed since they were made."

Todd Warden, for the State, corroborated the testimony of the witness Beck, as to the fresh scratches on the face of the defendant when he was taken to town under arrest. He testified further that he had heard the defendant speak of Lowery, but could not remember his words further than that he said he would have revenge. On his cross-examination this witness stated that quite a number of persons live two or three miles southeast from where the shooting was said to have been done. He admitted that he was not friendly with the defendant, and that he had had a difficulty with the defendant's brother, in which the latter was shot. The State closed.

A. Scott testified, for the defendant, that he was at the place of the shooting on the evening after it occurred, and saw several tracks of a man in the vicinity. He saw Rogers or Warden put a boot in a track. The track was not as long as the boot, or else the dirt had fallen in at the heel and toe.

Cross-examined, the witness stated that the track was a little

creened over at the heel. It was Warden, the witness thought, who applied the boot to the track. The witness looked at the track at Warden's request, and told Warden that the track had filled in with dirt, or that the boot did not make the track. The witness did not see Rogers put on the boot. He left Warden, Beverly and Rogers at the place where the track was.

Andy Lucas was the next witness for the defense. He testified that, about eighteen months before this trial, Lowery told him that he intended to leave where he was living and move to McKinney or somewhere else; that he had enemies living around him in his neighborhood, and was afraid that he would be way-laid and shot like the old negro, Jake Cartwright, was. Lowery moved from the neighborhood of the defendant to where he now lives about one year previous to this trial. This conversation occurred in the field of Jim Snider.

On his cross-examination, the witness stated that he was related to the defendant's wife. He heard the defendant threaten to kill Harrison Lowery, about two months before this shooting, but paid no attention to the threat.

John Eaton testified, for the defense, that he lived about a quarter of a mile from the defendant, and remembered well the evening on which Lowery was said to have been shot. On that same evening, about dark, the defendant passed the house of the witness on horseback, going home. He checked up, spoke to the witness, and went on in a lope.

Mrs. Margaret Meyers testified that she was the wife of the defendant, and lived five or six miles southeast from McKinney. She remembered the evening on which Lowery was said to have been shot, which was Friday, the twenty-eighth day of October, 1882. The defendant went to town on that morning, and reached home between sundown and dark that evening. She saw him when he first came home, at which time he unsaddled his horse, and either he or his little son fed the animal at a trough in the yard. Some minutes after the horse was fed, the witness called to the defendant to come in to his supper. After supper the witness and the defendant went to the cow lot, and the defendant kept the calves off while the witness milked four cows. The milking finished, the two left the cow lot together, the witness going into the house with the milk vessels, and the defendant turning off, saying he was going to stake his horse. He went off in the direction of the place where he usually staked his horse, and returned inside of twenty minutes. The witness felt

sure that he could not have been gone longer than twenty minutes.

The defendant did not take his gun with him when he went with the witness to milk, nor did he take it with him when he went from the cow lot to stake his horse. He had no gun with him when he returned to the house from staking his horse. The witness had not finished cleaning up and putting away the milk when he returned from staking his horse. After finishing this task, the two, witness and defendant, sat down and talked awhile, and then retired together. They did not go to sleep immediately on retiring, but lay in bed and talked for a time. It was at least an hour and a half or two hours after dark when the defendant and the witness went to bed. The defendant was not out of the sight of the witness from the time he returned home that evening until ten o'clock at night, for even the space of the half of an hour. The place southeast of Rogers's place, where the shooting was said to have been done, is three miles distant from the residence of the witness and defendant, and at no time was the defendant out of the sight of the witness a sufficient length of time to have enabled him to have gone to that place and returned. The defendant rode a small gray pony to town on that day, and rode the same pony to town the day after, when he was taken in custody.

Sheriff Warden, Todd Warden and Gabe Beck reached the house of the defendant about one and a half hours before day on the morning of Saturday, October 29, and arrested him. Todd Warden and Beck went down into the field and got the pony where he was staked, and on their return took the defendant to town. The defendant owned a double barreled shot gun, of which one barrel was out of repair. The gun could only be fired from one barrel, and this barrel the defendant discharged at something flying over the yard, either on the morning of Friday, October 28, or on that of the day previous, Thursday, October 27. The witness was in the house at the time and did not see the defendant shoot. He was accustomed to shooting the gun off frequently. The country around the defendant's house was very bushy, and the defendant was riding around almost every day. Sheriff Warden carried the gun off with him. He, Warden, asked the witness, when he took the gun, when it had been discharged, and the witness replied that it was fired off the day before or the day before that.

Cross-examined, the witness testified that the defendant fre-

quently assisted her in her milking of the cows, but could not say that he did so on two designated evenings prior to that of the alleged offense. They occupied between thirty and fifty minutes milking the four cows on that evening. The witness had been picking cotton that day, but quit the cotton patch shortly before sundown and commenced cooking supper. She had not fully prepared supper that evening when the defendant reached home. W. J. Thornton married the defendant's sister. The witness did not tell Thornton in the summer previous, in Dave Meyers's yard, that she never would die satisfied unless the defendant killed Lowery. She did not tell Thornton that she would leave the defendant, unless he, the defendant, killed Lowery. She did not tell Robert Staggs, in the Dave Meyers field, in the fall previous, that she did not believe that the defendant shot Lowery, but that she wished he had killed the nigger. She may, however, have said that she knew that the defendant did not shoot Lowery, but that she wished that whoever did do it had killed him. Staggs is about twenty years old, and is a step-son of the defendant's brother, Dave Meyers.

When Mr. Warden took the gun, and about the time he was leaving, the witness may have asked him "what do you suppose they will do with Fayette?" He did not then say to the witness: "You know better about that, Margaret, than anybody else; you know if he was here last night?" The witness did not refuse to reply to such a statement of Warden, because no such statement was made by him. Warden asked the witness if she could swear that the defendant was at home that night, and she replied that she could swear that he was. He then told the witness that if she could so swear, that she could clear the defendant. The witness did not see the defendant reload the gun after he shot it off.

Re-examined, the witness stated that she had intended to take some cotton to the gin on the day of the defendant's arrest, but when, in the conversation spoken of, she told Warden that she could swear the defendant was at home on the night of the shooting (the night before), he, Warden, told the witness that she had better go to town, as the defendant might have his examining trial on that day. It looked like rain that day, and the witness's cotton was picked out and was lying on the ground, loose. Warden told her that she had best cover up the cotton, and go to town, and she did so. The witness did tell Mr. Warden that it looked like they had more trouble than anybody;

that whenever they got a little ahead, something happened to pull them back.

In rebuttal, the State introduced W. J. Thornton, who testified that during the previous summer the defendant's wife, in Dave Meyers's yard, said to him that she would never die satisfied unless the defendant killed Lowery. She also said that she believed she would have defendant kill Lowery. On his cross-examination, the witness stated that he was on bad terms with the defendant, and did not know any man upon the top of God's earth whom he hated more than he did him. That he, witness, was a desperate man, and his mind was very hard to control. He was prosecuted a year or two ago for stabbing the defendant. He did not know that the county attorney agreed with his attorney to take a plea of guilty for simple assault for the stabbing, for the reason that he, the witness, was an idiot. No one was present at the conversation in which Mrs. Meyers made the remarks alluded to. The witness advised her not to talk so. Prior to the time the witness stabbed the defendant, the defendant struck at the witness or his horse with a whip, and hit the witness.

Robert Staggs testified, for the State, that the wife of the defendant, some time last fall, after Lowery was shot, said in his presence in Dave Meyers's field, that she did not believe that Fayette did shoot Lowery, but that if he did, she wished that he had killed him.

On cross-examination, the witness stated that W. J. Thornton, his wife and the witness were in the field, picking cotton. Mrs. Meyers came to where they were, and made the remark to Mrs. Thornton. Witness and Thornton were about thirty yards distant. The two women talked some time, but witness could not say what they said. Mrs. Thornton lived in Collin county, but was not present on this trial. The witness was a step-son of the defendant's brother Dave.

Williams Warden, recalled by the State, in rebuttal, stated that as he was leaving the defendant's house on the morning of the arrest, Mrs. Meyers asked him: "What do you think they will do with Fayette?" The witness replied: "I don't know, Margaret; you know better about that than anybody else. You know if he was here last night." She made no reply, but began talking about their bad luck, and said: "When we get a start, something comes up to draw us back." The witness sent his deputies with the defendant, and remained himself to get the

gun. He asked Mrs. Meyers for it, and she asked what he was going to do with it. He replied that it might be the means of clearing the defendant. She then remarked that he had shot it off either on Thursday or Friday morning previous, at some geese or ducks.

Cross-examined, the witness stated that since hearing Mrs. Meyers testify on this trial, he remembers that Mrs. Meyers said that she had some cotton in the field, and was afraid it would rain on it, and that she intended to carry it to the gin; whereupon the witness told her she had best go to town, as the examining trial might be held that day. The witness was present and heard Mrs. Meyers testify on the examining trial. The witness testified on that trial, and may or may not have stated that she refused or failed to reply when the witness told her she knew whether or not the defendant was at home on the night of the shooting. Reading over his testimony before the examining court, the witness found no such statement. The reason was, he supposed, because no question to elicit such statement was then propounded to him.

By five witnesses, the defense proved that the reputation of W. J. Thornton for truth and veracity was notoriously bad.

The motion for new trial assailed the evidence as being insufficient to support a conviction, or to serve any other purpose than to raise a suspicion; attacked the ruling of the court in excluding certain evidence; arraigned the charge of the court, and denounced the verdict as unsupported by law or evidence.

No brief for the appellant has reached the reporters.

*J. H. Burts,* Assistant Attorney General, and *John A. Gordon,* for the State.

WHITE, PRESIDING JUDGE. "Criminative or inculpatory circumstantial evidence" is mainly derived, according to Mr. Burrill, "from two principal sources—the conduct of the party accused, and external objects, with their appearances as indicative of such conduct." External objects, or "physical facts" as they are termed, are admitted in evidence for the purpose of both establishing the crime and to indicate, trace out and discover the criminal. (Burrill on Cir. Evid., 252.) Amongst such facts or circumstances are the instruments of the offense and

the appearances of such instruments, such as signs of a fire arm having been recently discharged, etc. (Ib., pp. 254 and 255.)

Where the use of fire arms is as common as in this country, it can scarcely be said to be a matter of peculiar skill to determine whether or not a fire arm has been recently discharged. If, however, it is necessary that a witness should qualify himself as an expert before his testimony is admissible as to that fact, then we think the witnesses in this case qualified themselves sufficiently before testifying as to their opinion on the subject. They showed they had had experience in the use and handling of fire arms, and stated that they inserted the finger into the muzzle of the defendant's gun, and when the finger was withdrawn it was wet and black, from which, in their opinion, the gun must have been recently discharged. (*Connor* v. *Sturtevant*, 117 Mass., 122.) As expert testimony, the court did not err in admitting the evidence.

Defendant's second bill of exceptions was taken to the admission, over his objections, of the testimony of the witness Rogers, and also of the sheriff Warden, with regard to footprints near the scene of the shooting, and the fact that they testified that the witness Rogers put on a boot belonging to defendant, which the sheriff had taken off defendant's foot, and applied it to a track which had been found there in a pile of soft dirt, which it fitted, and made other tracks with it which the witnesses examined and compared, and found them to correspond in size, shape, appearance and peculiarity, both with the said track and shape and size of the boot.

Footprints and other marks upon the soil are physical facts, and are legitimate evidence. "The character of footprints leading to the scene of murder, and their correspondence with the defendant's feet, may always, when defendant's agency is disputed, be put in evidence. Such evidence is not by itself sufficient to sustain a conviction. But it is an item of circumstantial evidence proper for consideration as such." (Whart. on Hom., § 705; *Hubby* v. *The State*, 8 Texas Ct. App., 597; *Walker* v. *The State*, 7 Texas Ct. App., 246; Wharton on Crim. Evid., 8 Ed., § 795.)

In *The State* v. *Outerbridge*, 82 N. C., 617, where circumstantial evidence was relied on to convict of murder, and, as a link in the chain of such evidence, it was held competent to show that a bullet taken from the body of the deceased and one taken from a tree near the spot where the body was lying, fitted the

moulds found in the possession of the prisoner.   Nor was it held error in the judge to refuse to withdraw such evidence from the jury when the result of interrogating the State's witness by the prisoner's counsel was the exhibition and comparison of the bullets and moulds in view of the jury.   Whatever may have been the opinions or doubts of courts with regard to the legality and admissibility of such evidence formerly, that it is legal and admissible is now too well settled to admit of further controversy.   And in this case the action of the court was not erroneous.

Complaint is made of the charge of the court.   We have been able to find no error of omission or commission in its presentation of the law applicable to the facts of the case.   There was no occasion for discrimination between express or implied malice, or even to explain the latter character of malice to the jury. Had death resulted from the shooting, it could have been nothing less than murder of the first degree—murder on express malice, and murder by lying in wait; an assassination, in fact.

We have been unable to perceive any error in the proceedings which have resulted in the judgment of conviction in this case; and the evidence, in our opinion, being amply sufficient to sustain the judgment, it is in all things affirmed.

*Affirmed.*

Opinion delivered April 11, 1883.