𝔖upreme 𝔔ourt.—𝔊eneral 𝔗erm.—𝔉irst 𝔇epartment.

*June*, 1887.

## PEOPLE v. DRISCOLL.

### EVIDENCE—REQUEST TO CHARGE.

The silence of a person with respect to a crime which he witnessed, may affect the credibility of that person's testimony in regard thereto, but not the competency of his evidence.

To reverse a judgment on the ground that the verdict is against the weight of evidence, the appellate court must see that the result reached by the jury was in conflict with the evidence as a whole, or against the preponderance of proof.

Where proof is given that the victim of a crime in the absence of defendant and not being in expectation of death, accused a third person, in the presence of such person of the crime, what such third person said to the victim in answer to the accusation is admissible.

After defendant has adduced evidence in cross-examination as to what kind of pistol a certain person carried and what he did with it, it is proper for the prosecution to produce the weapon itself for the inspection of the jury.

A witness stated the appearance and condition of a pistol, and then stated that when he examined it there were no indications that it had been recently fired off. The pistol was produced before the jury. *Held*, that the opinion of the witness was admissible as a mere short-hand rendering of the facts.

After an accurate recital of the evidence relating to a witness, the trial-judge instructed the jury that the jury might take these circumstances into consideration and say whether there was any inducement for the witness to testify falsely concerning the occurrence in order to shield himself. *Held*, a sufficient instruction on the question of motive.

An exception to a refusal to charge a request is unavailing where the request is charged in substance.

APPEAL by defendant Daniel Driscoll from a judgment of the court. General Sessions of New York, September 30, 1886, Hon. Frederick Smith, presiding, on conviction of murder in the first degree.

The facts fully appear in the opinion.

*William F. Howe*, for defendant appellant.

*McKenzie Semple*, Assistant District Attorney for the people respondents.

BARTLETT, J.—On the 26th day of June, 1886, a young woman named Bridget Garrity, was shot and mortally wounded at number 163 Hester Street, in the city of New York, and on the following day she died. The question litigated in the present case was whether the defendant, Daniel Driscoll, or another man, one John McCarthy, fired the fatal shot. The place at which the homicide occurred was an assignation house kept by McCarthy. He and Driscoll were men of bad character, both of whom had been imprisoned for crime, and they appear to have been bitter enemies to one another, as McCarthy had tried to shoot Driscoll not long before this occurrence. According to the case for the prosecution, however Driscoll was the aggressor in this instance, going in company with Bridget Garrity between three and four o'clock in the morning in the house of McCarthy in order to attack him, and unintentionally killing the girl in his efforts to shoot McCarthy. On the other hand, the defense sought to show that the prisoner, who had been drinking, got into the house without knowing it was McCarthy's, whereupon McCarthy fired on him and killed his companion. The jury adopted the view presented by the prosecution and convicted the defendant of murder in the first degree.

We are not satisfied that this verdict was against the weight of evidence.

The principal witnesses for the prosecution who testified concerning the circumstances of the shooting were McCarthy himself, and Carrie Wilson, a prostitute. The character of these persons is severally criticised, but it should be remembered that unless murder in places of evil resort is to go unpunished, recourse must usually be had to the testimony of witnesses whose tendencies and habits are evil. Otherwise, they would not be present at the scene of crime. Carrie Wilson's story of the homicide was clear and direct. She was about leaving the house, when a carriage stopped at the door, bringing four persons, two of whom, Daniel Driscoll, and Bridget or Bezie Garrity, as she was called, came up into the hallway. There Driscoll told the witness he wanted to speak to her and tried

to force her from the hall into the front room but she re-treated toward the rear of the house. Meantime Bezie Garrity had gone into the front room, and was standing between the open folding doors leading thence into the room back of it, while the prisoner stood out at the threshold of the door opening from the hall into the front room. She gave Driscoll a nod and Driscoll put his hand in his pocket and drew a re-volver and put it between the jam of the door and fired a shot. This shot does not seem to have done any harm. Then the prisoner went further back in the hall to the door leading into the back room, burst open the door, and fired a second shot which struck Bezie Garrity and inflicted the wound from which she died. McCarthy swore that he was in the front room in company with a number of men when the deceased and the prisoner came in ; that he immediately forced the prisoner out into the hall and partly closed the door; that the deceased then caught hold of the witness, told him not to shoot Driscoll and forced him back just past the crack of the partly opened door when he saw the barrel of a pistol stuck through, and the first shot was fired. Then McCarthy ran and jumped out the back window of the house, returning fifteen or twenty minutes later.

Counsel for the appellant lays great stress upon the state-ment of Carrie Wilson that she did not see McCarthy in the house on the morning of the homicide, although she describes the shooting in so much detail and although McCarthy admits that he was present. Her position in the hall, however, appears to have been such as to make it quite credible that McCarthy could have been in the rooms without being visible to her ; and her testimony clearly indicates that she knew there were a number of men in the front room, but could not see them. The crime was committed about four o'clock in the morning, and this witness seems to have said nothing of the shooting to any one until she told a police captain on the evening of the same day. She went to her rooms and talked fifteen min-utes with a friend before going to bed, but did not tell her of the shooting, nor did she mention it to her mother, with

whom she took dinner some hours later. It is insisted that if she had really seen what she says occurred at the time of the homicide, she could not have kept silent on the subject under these circumstances. This was a question for the jury to consider in passing upon her credibility. We cannot say that they ought to have rejected her testimony concerning the crime because of her silence afterwards. It was a fact bearing upon the probable truthfulness of her story but not necessarily inconsistent with veracity.

In support of the proposition that the verdict was against the weight of evidence, the positive testimony in behalf of the defense is fully set forth in the brief for the appellant. Owen Bruen, who accompanied the prisoner and the deceased, testified that as soon as they entered the door McCarthy shot at Driscoll and the girl was wounded. He is sure he did not see any pistol in the prisoner's hand that night. Driscoll himself says that when they were in the hall, and were about to enter the room, the girl being a little in advance of him, a shot was fired and she exclaimed that she was shot. He then fled from the house. He denies that he fired at McCarthy and swears he had no pistol. Much reliance is also placed upon the declarations of the girl, one just after she was wounded, and another in the hospital to the house surgeon, that McCarthy or the man with the red whiskers (meaning McCarthy) shot her ; but the force of these statements is seriously lessened by her dying declaration to her mother that " Danny Driscoll " did it.

It should be observed that the case for the prosecution did not rest upon the testimony of McCarthy and Carrie Wilson alone. A police officer testified that he saw the defendant and his companions in Bayard Street about an hour before the homicide ; that Driscoll caught Bezie Garrity by the arm and threatened to kick her, saying " you won't stick to me " ; and that the girl responded " Yes, Dan," I'll stick to you ; you shoot him, and I'll stick by you." A newspaper dealer named Green, who was asleep in the front room of the Hester Street house where McCarthy was, and who appears to have been

awakened by the first shot, swears that the shot by which the girl was wounded was fired after McCarthy had jumped out of the back window. A bullet was found in the wall of the front room, opposite the door, where it could hardly be if it came from a pistol fired by McCarthy as testified by the witnesses for the defense, but where it would naturally be if it came from a weapon pointed into the room from the hall. These and other facts in proof tended to corroborate the principal witnesses for the people. The conduct of McCarthy and Driscoll, respectively, immediately after the shooting, should also be considered. McCarthy reappeared in the house in the course of about fifteen minutes and handed his revolver, then fully loaded, to a policeman present. The calibre of this pistol was smaller than the calibre of the bullet dug out of the wall. Of course there was a possibility that McCarthy had been armed with a different weapon at the time of the shooting, and had procured this one during his short absence from the house, but there is no evidence of any such fact. It may also be suggested as somewhat strange that he should have retreated so precipitately from the scene, without firing upon Driscoll, but the sudden character of the attack might well account for his conduct in this repect. On the other hand Driscoll, who wore a sacque coat at the time, ran through the streets, holding his right hand in his right pocket, and pursued by a policeman, until he found his way into No. 128 Baxter Street, a house from which his mother had just moved, where he was finally discovered lying on the floor, behind the door in an unoccupied room upstairs, and without any coat. The obvious inference suggested by the manner of his flight and the disappearance of his coat was that he carried a pistol in his pocket as he ran, and threw it away with the coat.

This review of the facts suffices to show, we think that the motion for a new trial on the ground that the verdict was against the weight of evidence was properly denied. If truthful, the testimony for the prosecution was abundant to sustain the finding of the jury. There was a direct conflict

of proof as to the person who fired the murderous shot. Upon this issue, the jury, who saw and heard the witnesses and could observe their appearance and manner on the stand, preferred to believe those who testified against the prisoner. In reviewing their action, we are not called upon to try the case over again upon the printed record, but only to say whether the result they reached was in conflict with the evidence as a whole, or against the preponderance of proof Unless we deem it to be so, we cannot grant a new trial so far as this branch of the case is concerned.

The alleged errors of the learned Recorder in the admission of certain evidence and in refusing to charge certain requests remain to be considered.

It is argued that the court erred in receiving evidence of what McCarthy said and did when confronted with the deceased in Driscoll's absence, subsequent to the shooting.

Peter J. Monahan, a police officer, who reached the premises shortly after the girl was wounded, and found her lying on a bed in the back room, testified as follows: Q: Where was she shot? A: She was shot in the abdomen; I believe in the left side. Q: Go on. A; I asked her who shot her. She said " The man with the red whiskers. " With that McCarthy came into the room. He says " Monahan, so help me God, I did not shoot this woman." He says " Here is my revolver ; " and he pulled it out of his pocket and handed it to me. " Here is the revolver." Counsel for the defendant then moved to strike out what McCarthy said and did on the ground that Driscoll was not present, and that the testimony was incompetent. The motion was denied and an exception was taken.

In order to judge of the correctness of this ruling it is necessary to know what had gone before. The defense, in the cross-examination of McCarthy, had clearly brought out the fact that the girl had accused him of the crime. No reference was made to this subject on his direct examination but in answer to defendant's counsel he said that Bridget

Garrity told the officer in his presence that he, McCarthy, had shot her.   The purpose of this testimony, of course, was to show that the homicide was committed by a person other than the prisoner.   So far as it tended to incriminate Mc-Carthy, it tended to exonerate Driscoll.   Its effect in the direction of establishing McCarthy's guilt would depend very much upon the manner in which he received the charge. Silence might be construed into a tacit admission of its truth, while a prompt and emphatic denial on the spot would prevent any unfavorable inference growing out of the action of the accused on such an occasion.   This was not a dying declaration on the part of the wounded girl and was not offered as such.   The theory on which the evidence was received is not apparent.   The charge and the denial, however, constituted parts of one and the same transaction, and we are of the opinion that after proof by the defendant that the girl, not speaking in expectation of death, had ac-cused a third person of the crime, it was proper to permit the prosecution to show what that third person said to her in response to the accusation.   It is strenuously insisted that the denial by McCarthy was not a part of the *res gestæ* under the rule laid down in the case of *Waldele* v. *N. Y. Central, etc., R. R. Co.*, (95 N. Y. 274), but the same argument would apply equally to the charge which the girl made against McCarthy.   Both the accusation and the response were statements or declarations relating to a past event,—that is, the shooting,—and if, under the circum-stances, the denial was not a part of the *res gestæ* neither was the charge.   If any view, if it was competent for the prisoner to give evidence of the one we think it was com-petent for the people to give evidence of the other.

The next alleged error called to our attention in the admission in evidence of the revolver said to have been carried by McCarthy at the time of the homicide.   objection was made not only to the introduction of the pistol itself but generally to any testimony in reference to the weapon.   This objection was properly overruled.   Much earlier in the trial,

when McCarthy was under cross-examination, the prisoner's counsel had proved by him what kind of a pistol he carried, how many chambers it had, when and under what circumstances it had previously been discharged, and how McCarthy, when accused of the shooting, voluntarily handed it to the policeman, saying, " Here, you take charge of that. " After this evidence, adduced by the defendant, it was entirely proper to let the jury see the weapon itself.

Another ruling upon which the appellant relies as being erroneous was the refusal of the learned Recorder to strike out certain testimony given by the officer in reference to the condition of the revolver when he received it from McCarthy. The witness testified that in company with some other officers he examined the revolver and saw that it had not been fired off. " The barrel was cold; it was not warm ; there was no indication that the shots had been fired off ; they were still full. " The court then said to the witness. " The barrel was cold, and there was no indication that you discovered that it had been recently fired ; is that right ? " to which the witness responded. " Yes sir." Counsel for the defendant asked that this be stricken out, but the court allowed it to stand and noted an exception. It is urged that the evidence constituted merely an opinion of the witness which was not admissible. The motion to strike out was not placed upon this or any other specific ground, and in our opinion was properly denied. The only portion of the testimony which could possibly be deemed opinion evidence was the statement of the witness that he discovered no indication that the revolver had recently been fired. Wharton states the rule to be that " when the opinion is the mere short-hand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts on which it is based. (1 Wharton on Evidence, S. 510.) The statement in question was certainly no more than this. In the case of *Wynne* v. *The State* (56 Ga. 113) one of the grounds upon which the prisoner moved for a new trial was that the court allowed a witness to express his opinion whether the

cartridges used in a pistol had been punctured by snapping them before they were fired. " We think," said the Supreme Court of Georgia, " that any witness after stating the appearance of the pistol and cartridges with indentations of the absence of indentations, and that he was familar with the use of the weapon from having practised frequently with it, should have been permitted to express such an opinion, with the right of the jury, of course, to form and find their own opinion upon all the evidence. " Here as there, the weapon was before the jury. They had also heard described the condition of the pistol, upon which the witness based his conclusion that no indications of recent firing were apparent. (See *Commonwealth* v. *Sturtivant*, 117 Mass. 122). In view of all the facts no error was committed in allowing the evidence to remain in the case.

Finally it is contended that the trial court erroneously refused to charge two requests presented in behalf of the defendant.

By the fifth request, the Recorder was asked to instruct the jury as follows: " That in considering the evidence of McCarthy, the jury must take into consideration the motive to shield himself if he fired the shot, together with the evidence of McCarthy's convictions and sentence for robbery; and while these facts do not of themselves require a rejection of his evidence, they are to be considered by the jury on the point as to whether a man bearing the character of McCarthy, would not, where an inducement existed, be more likely to swear falsely than would a person of good character."

To this request, the Court said " I will charge on that subject, not in that way," and counsel duly excepted.

In the charge as delivered, the jury were fully and correctly instructed in reference to the character of McCarthy and his previous convictions, but complaint is made that nothing was said therein concerning McCarthy's motive to shield himself if he fired the shot. Attention had already been directed to this motive, however by the third request,

which the Court charged, whereby the jury were told to consider that McCarthy was armed with a pistol at the time of the shooting and that the deceased, immediately after being shot, charged him with having shot her, and that therefore in testing the evidence of McCarthy as to its truth the jury might, "take these facts into consideration, to say whether there was any inducement for McCarthy to testify falsely concerning the occurrence of that night in order to shield himself." We think this instruction sufficiently covered the question of motive. The motives which might influence McCarthy to testify falsely were so obvious that the jury could hardly have failed to keep them in mind even if nothing had been said by the Court on the subject, and it is to be observed that counsel did not call the attention of the Recorder to the omission to charge further in this respect.

The learned Recorder also declined to charge the sixteenth request in the form in which it was presented, as follows: "That whenever in the deliberation of the jury it becomes necessary for them to find the existence of any fact in order to arrive at a verdict, and if from the evidence the jury have a reasonable doubt as to the existence of such fact, the prisoner is entitled to the benefit of such a doubt." In answer to the request immediately following, however, the Court said, " I will charge the jury as to what a reasonable doubt is, and the fact that the prisoner is entitled to the benefit of it upon every element necessary to convict in this case." This was in substance and effect the instruction prayed for by the sixteenth request, and renders unavailable the exception to charge it in form.

No other legal propositions than those which have been considered are presented in the brief for the appellant or were discussed upon the oral argument. Neither upon the facts nor upon the law of the case are we able to say that the conviction was wrong. The judgment should therefore be affirmed.

VAN BRUNT, P. J. and DANIELS J. concur.

NOTE.—This judgment of affirmance was affirmed by the Court of Appeals 29th November, 1887.