## STATE v. JAMES.

1. A witness who has had an opportunity of observing the intercourse between two persons may be asked whether these persons are friendly or otherwise, although his answer can be nothing more than an expression of opinion; but if, upon cross-examination, it appears that his opinion is based wholly upon what he has heard them say, his answer should be excluded.
2. The limit and extent of the constitutional provision that "judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law," considered and declared.
3. The trial judge violated this provision when he intimated to the jury his impression that the prisoner was guilty, and that the testimony of a witness for the prosecution was corroborated, and especially so when he instructed the jury that no inference favorable to the prisoner could be drawn from a certain line of evidence introduced by the defence.

Before PRESSLEY, J., Darlington, March, 1889.

. The charge was as follows:

MR. FOREMAN AND GENTLEMEN: We have listened very patiently to the testimony and the argument in this case, and now comes the time when we are to do our duty. The main duty in this case is with you. There is very little law involved in it, and I have nothing to do with any implications or any opinion whatever on the facts. My duty ends when I shall call your attention to the law—the settled legal principles by which you are to be governed in arriving at a correct conclusion in a trial of this sort. I shall do that to the best of my ability. If this defend-

ant hired another to kill his father, and his father was killed, one thing is certain: none of that father's blood shall rest on my hands when I get through; and I have no reason to suppose that any of you differ from me in your determination on that point.

Now, let us see what are the principles upon which you are to start out in deciding a case of this sort. The law says, first, that you shall give the defendant the benefit of all reasonable doubts, and it is my duty to explain to you what is a reasonable doubt. That is very easy. It is when the testimony in the case, taken all together, with all its facts and circumstances, does not bring your mind to an unshaken conviction that the thing charged is true. Then, if that be not the case, it is a reasonable doubt; but if that be the case, you are not at liberty to say, "It may be this," or "It may be that," or "It may be something else." You are to follow the convictions of your mind, as the testimony has brought your mind to. That is what you are bound to do—follow the convictions of your mind—if they be of such a nature as in the solemn affairs of your life you would be willing to say: "I am satisfied that such and such is true, I will act."

Well, what next? In investigating this case, you are not to take one circumstance by itself, or two circumstances by themselves, or three facts, or any number of facts by themselves, and say, "These are not enough, they don't satisfy us." That won't do. You must take them all together, you must take all the testimony and all the circumstances together, and say whether they all, united together into one strand, form a strand that cannot be broken. A single strand is easily broken, two or three may be easily broken, but you are to put them all together, and then say what is their effect. Do they produce conviction or not? If they do not, then say, "Not guilty;" if they do, then say, "Guilty."

The next thing is: You are to start out assuming that William Scott is not a credible witness. The law says so. You are to start out assuming that—that, taking his testimony by itself, neither reason, nor common sense, nor the law, permits you to rely upon it in so serious a matter as this, if you take it by itself. I say that not with regard to the testimony brought by the defence to contradict him and discredit him on various points;

I say it in reference to the law that what he confesses of his own guilt in the matter renders him, in the eyes of every reasonable man, as a witness that is not credible; and therefore the law says it is very unsafe to convict a person for a murder, or any serious offence, on the testimony of one who acknowledges he has had such connection in the transaction, unless what?—unless that testimony, in the number and the manner of the details, is such as that he could not have manufactured it, or, unless it be stated in such manner, and be accompanied by such circumstances, that you are not able to discredit it. Or unless it is corroborated by the circumstances which, taken with that testimony—those other circumstances, not taken by themselves, nor that testimony taken by itself, but whether the two together—the other circumstances and his statement taken together, whether they produce conviction. The difference is this: that though the witness is not credible, yet he may tell the truth, and you are to judge not whether you can rely on his testimony, but whether his testimony so tallies with all the other circumstances of the case as that you regard it corroborated, and, therefore, are brought to the conviction that whether he can be relied upon or not, yet, whether he is telling the truth in this case. That is the rule you are to follow.

Next, it is indicated that the testimony of some of the witnesses for the State in this case is influenced by improper motives, and the expectant reward is mentioned as one of the improper motives that would influence their testimony. Well, if one is to be influenced by a motive of that sort, he would be influenced by the stronger motive, and you are to judge now whether this insinuation, this hint, be correct or incorrect, from the fact whether the stronger motive would be to go against Scott and get the thousand dollars that was offered, or whether it would be to go against the defendant and get only the reward which the governor has offered. That is a question for you. In weighing their testimony you are bound to consider that, whether if improper motives influenced them, on which side was the stronger motive, the motive to let James escape and get the thousand dollars he offers, or the motive to try him and lose the reward he offers, and only get that the governor offers.

Next, some records have been introduced going to show that when Bell was tried for shooting the old man, that when Daniels was tried for shooting the old man, and when Fields was tried for shooting the old man, in each case his son, now the defendant, was a State's witness against them. It is introduced with the idea that the legal inference is to be drawn from that going to show that he has taken part in trying to prosecute and follow up those that were trying to kill his father. I am bound to say to you that the bare proof of the fact, standing by itself, does not furnish ground for legal inference that he was so doing. It is not testified that he took part in getting up those prosecutions : it is not testified in any way whatever that he was active in the matter ; the testimony that he gave against those parties is not before you, except in one case a witness was put on the stand by the defendant to say whether he testified in that case against Bell, and the witness replied : "He testified against him and for him. And that Bell was acquitted." In the case of Daniels he testified, but no witness says how he testified ; and therefore no inference can be drawn. Nobody knows—and you are to judge by the testimony—nobody knows whether he was a willing witness, or whether the State brought him up and compelled him to testify.

Mr. Dargan : May it please your honor, a witness testified that the defendant assisted in the arrest of John Daniels.

The Court (to Mr. Dargan): And I say no inference is to be drawn from that.

Mr. Dargan : I think your honor's language was that he took no part.

The Court (to the jury): What I mean is, that there is no proof that he assisted in ferreting out the parties and bringing them to trial. The mere fact that he assisted in the arrest you can draw no legal inference from. Furthermore, let me call your attention to the fact that two of those parties escaped, one was convicted. Now, the law holds that the one who was convicted was guilty, and the law also holds that the two who were acquitted were not guilty. Then the guiltless parties escaped, and we do not know really who it was that directed attention towards the innocent parties who were acquitted. We don't know who directed attention towards the innocent parties. All I mean to say is,

that no inference can be drawn from the fact that he was put up
as a witness ; because you are not to know whether he put the
State's officers on the wrong track. You don't know that he did,
and you don't know that he did not. There is no proof that he
did, and there is no proof that he did not; All I mean to say is, that
you are not to consider those matters as proving that he took an
active part in trying to find out who was shooting his father from
the mere fact that he was a witness on the record. Well, now,
these are the general principles which will guide you in the inves-
tigation of this case.

And now we will come down to that, and assuming that Wil-
liam Scott is not a credible witness, let us come down to the
investigation of the fact of what he has said, and how far he is
corroborated. And your first inquiry should be, who killed the
old man ? Who killed him, or, in other words, did William
Scott kill him or take part in it ? Did he kill him, or was he
present aiding and abetting ? He says that he did. He says he
was present acting as captain. I am not enough familiar with
matters of this sort to know whether the captain should stand off
and watch, should stand off where he could see the parties that
were to do the deed, and at the same time watch for anybody
coming from the outside. I will not undertake to say. I will
not indicate whether the proper place for the captain was where
he said he was or whether he should have been in the face of
danger, and had somebody else to watch. I don't know that you
know. I don't know whether persons who go to do things of
this sort always have somebody on the watch or not. But the
first question now is, did he either do the thing himself or place
the parties that did it? Well, he says he placed the parties there,
and for the purposes of this case except as it affects his credibil-
ity, and that is gone already, for the purposes of this case it does
not matter whether he did it himself or put the parties there to
do it.

So, then, if you reach the conclusion that he did either do the
thing himself or took part in doing it, your next inquiry will be,
who assisted him ? He names Louis Williams and Bob Arthur
as the parties who were his co conspirators. Is that true ? The
witnesses say that when Louis Williams was arrested he said not

a word. he did not ask what he was arrested for, gave himself up and went to jail quietly. That is what they say—the three who arrested him. Does that corroborate William Scott's story that Louis Williams was one of the party? That is entirely for you. And you have heard the other testimony about the different houses at which he was seen, the time he left home that afternoon, the course that he went and the time he came up the next morning and his subsequent conduct. I need not repeat it to you. Are you satisfied that William Scott and Louis Williams are the persons that took part in this most outrageous murder? And was Bob Arthur the other party? All that you know of him outside of what William Scott says was having been seen under certain circumstances after the killing. He has disappeared. There is no testimony whatever that will warrant you in holding any reasonable account for his disappearance. If he disappeared because he was fearful of being tried for a matter with which he was charged. how did he know that he was charged with a part of this matter? Who told him? If some person told him, who was that person? I don't know. All I know is that he has disappeared. So that you see, gentlemen, of the two persons who William Scott says took part in this murder, one did not even ask why he was arrested, went to jail quietly, submitted, and the other has disappeared. Does that corroborate William Scott's testimony? Does it bring your mind to the unshaken conviction that William Scott has told the truth when he said that these two persons were those who took part in that murder?

If you reach that conclusion, then, gentlemen, you will next inquire what motive had they to do it? What motive had they to commit that murder? Did you hear any evidence whatever of the hostility of those three men against the old man? Where is the proof? Murder is committed either from hatred and malice, or it may be, perhaps, from fits of jealousy when a man actually discovers that another has been playing false with his wife, or from motives of robbery. Now, what one of these motives did these three persons have? If you see any evidence of hatred in the case, you will consider it; if you do not, you will not consider it. The second motive I have mentioned, what evidence is there of that? If you see no evidence of that, you will dismiss that. The

third motive: robbery. So far as I can construe the evidence that has been given, in the four times that the old man has been shot, not one of the persons attempted to rob him. There is no evidence whatever, in any case, that at any time any of the parties attempted to rob him. If that had been the object in a case of this sort, would a thief or a robber have been likely to go to a house where his son was, and where Mr. Harman Howell was, and close to the piazza, shoot him down, and then run off? If that had been the motive, would they?

If there be no proof, then, that the motive was robbery, then what was the motive? Well, William Scott says the motive was this: that the defendant, James, told him, "My father has a large amount of salaried property, and I want to get it into my hands." I don't know what he meant by "salaried property," but that is the term he used. "I want to get it in my hands." That is the motive he assigns for the defendant's having hired them to kill his father. That is the motive he assigns. Well, go back now. He says this thing began two years before the old man was killed, while he was working with Mr. Chapman, and the father and son were living there. That the father wanted to sell him a suit of clothes, and the clothes had shot holes in them, and that he said he had been shot; that the holes were made by his having been shot; that he had not the money to buy them then; and the son afterwards approached him and asked him what his father had been doing, and what he said. He says that the son said, "Well, John Daniels was charged with doing that; it was not Daniels, it was Prince Bradley" and another person he named. And from that time forth the planning, he says, continued. I will not go over the numbers of interviews and arrangements he described from that time forth. That while he was at Chapman's, and again while he was at Howell's, and subsequently while he was at DuBose's, those plannings and arrangements continued.

Well, now, is he corroborated? Is he corroborated in any of those matters in such a way as to bring conviction to your minds? He himself admits that he knew some time before this that Hooten had charged him with having tried to hire him to shoot his father, and that Hailey's name was mentioned at the same time with Hooten and in connection with Hooten. He admits that he

knew that; that his father told him so.  Hooten goes on the stand and testifies to it, and Hailey testifies he took the message. Hailey and Hooten have both been discredited by witnesses who say they would not believe them on oath.  McKay, another witness, has not been discredited, not a word has been said against his character, and he testifies that defendant applied to him to carry a message to Hooten, which he declined to do.  So that McKay testifies that defendant at that time—bad as Hooten's character was—was at that time seeking communication with him. Furthermore, the fact that his father told him. what Hooten said, brings home to him the knowledge that Hooten had charged it. What did he do to put that thing at rest while his father was alive?

And you must bear in mind that, whether he be a witness who can be believed on oath or not, this charge was made by him at a time when this defendant was not being tried, and was made by him when it ought to have put his father on the guard, and before the mischief was done.  Now, the question is not whether he is a credible witness, the question rather for you is, will a person who wanted to hire another to do a thing like that, be likely to go to one who would be a credible witness?  Would he or not?  Would he not try to seek out the worst man in the neighborhood to do it?  A man ready to do desperate things, and whom nobody would believe if he peached afterwards?  You must judge of his conduct under that charge; you must decide for yourselves as to his conduct under that charge, and whether or not Hooten—though not a credible witness—told the truth, he having made the charge long before the old man was killed.  You most remember what Thompson says about what was said to him going to the party.  You will remember that the defendant says that he does not know him, that he has never seen him.  You saw the witness on the stand; I do not know him; you must judge for yourselves whether he tells the truth or not.  If you don't know enough about him to know whether he can be relied upon, you will still say whether what he says is a circumstance to be added to the other circumstances of the case.  I will not go over the details of all the testimony, which has been twice gone over al-

ready, about these various interviews and about where this man was and where that man was.

The old man is killed; he is shot, and he cries out, "Oh! Joe, I am shot and killed." You have heard the testimony of the witnesses as to the conduct of Joe on that occasion, and you are to draw your own inferences from it. Was it that of an affectionate, dutiful son, or was it that of one different from an affectionate, dutiful son? Was his conduct such as to show any grief at all at the death of his father, any desire to bring the murderers to justice, or anything of the sort? What does he do? Where is the proof of anything he did to search out those murderers and bring them to justice? There was a reward offered by him subsequently, but the proof is that he did not offer that reward until he was advised to do it; and there is no proof that until that time he ever did anything whatever to assist in searching out the murderers.

If you come to the conclusion that William Scott did that thing, or took part in it, then do the circumstances which are proved bear out the defendant in what he said to the sheriff, that he had no suspicion of any person whatever? The proof is that he subsequently visited at William Scott's house; and the proof is, further, that at the time, and shortly before the old man was killed, Scott was constantly firing his gun as if practising shooting at a mark. That matter attracted the attention of others, and cast suspicion on Scott: yet he visited at Scott's house, and had no suspicion of anybody. Further, a piece of wadding was found on the body of the old man, and that piece of wadding was of a marked character, a piece of homespun with red check, and Ben Howell noticed a piece of that homespun on the body of one of Scott's children when he went there, and that this thing was discussed. It may be very possible that the defendant visited there frequently in the night time and noticed the same thing, but still it is a circumstance that you will consider when you come to consider the question whether he had any reason to suspect any one, whether he heard the firing, or knew anything about the check.

Well, the inquest is held, and the night after the inquest, Wednesday night, the whole neighborhood was gathered there,

the old man not being yet buried, but lying in his coffin; and William Scott goes there. He says he went after his money. It is for you to consider now whether if he did the deed or took part in it, he would have gone there if he had not gone for something. You are to consider that whether he would have gone to that place under those circumstances, if he did not go for something. He says that, sitting on the steps, the defendant came out, spoke to him there, and went to the well with him; that he asked him for the money, and defendant replied he could not pay him, because the doctor had taken the numbers of the bills that were found on the old man's body, and he could not be passing off those bills to him without first changing them. That is what he said.

He says, further, that defendant said, "How came you to put that check wadding in your gun?" "I said to him, 'What will you do about it?' He replied, 'I will make way with it.' I said to him, 'What have you done with it?' He replied, 'I put it over the mantelpiece.'" That is what William Scott said. "I put it over the mantlepiece." How did Scott know that? It is for you to say. He says the defendant told him. He says defendant told him he put that check wadding over the mantelpiece. He says he tried to put it in the clock, and not opening it, he put it over the mantelpiece, behind it there, or somewhere there, and it got lost. Another witness says that he put it in the clock; but the third witness says he tried to open the clock, and put it up there on the mantelpiece. Well, Scott says the defendant told him he put it there. Now, you are to account in some way for Scott's knowing that if the defendant did not tell him. That was Wednesday night. The check wadding is missing.

Friday the defendant is going down the road; he passes the road where Scott is hoeing cotton. Scott says defendant called him, and he went to him. You heard and will remember what he says about the action of defendant about inquiring, before speaking, if there was anybody in the ditch. Thereupon, he says, at that time he got the first warning, that he had better be on the lookout, that sheriff Cole was in the neighborhood ferreting out the matter. That is what he says. Is he corroborated?

Ben Howell saw the defendant there on that day at that place
talking to Scott.  He says that he did pass there, that he did
stop and tell him "Good morning," and that was all.  If the
defendant merely told him "Good morning," how came Scott to
leave his hoeing, as Howell says he did, and go to the fence to
him ?  Now, you have got to consider all these matters.  You
have got to regard Scott as not a credible witness, and not to rely
on his testimony, unless what he says carries conviction to your
minds, if you consider it corroborated by circumstances which
help to carry conviction to your minds.  I have nothing to say
about it.  I have called to your attention all the matters that
struck my mind, except some I intended to call your attention to
which counsel on either side have sufficiently discussed before you.
I will not repeat to you any more of the testimony.

Now, the solemn question is for you.  Can you explain these
circumstances consistent with the defendant's innocence ?  Do
they satisfy you, bring your minds to the unshaken conviction
that he is guilty ?  If all these circumstances can be explained
away by you reasonably, as not corroborating Scott's testimony,
then, as a matter of course, it is your duty to say, "Not guilty";
but if you cannot reasonably explain away all these circum-
stances consistent with his innocence, the law says it is your duty
to say "Guilty."

The defendant was convicted and sentenced to be hung, and he
appealed on the following exceptions :

1. Because his honor erred in admitting in evidence the declar-
ation of Joseph James, deceased, to the witness, D. G. DuBose,
four weeks before his death.

2. Because his honor erred in indicating in his charge to the
jury an opinion as to the influence which the rewards offered by
the defendant and the governor would have on the witnesses for
the State.

3. Because his honor erred in charging the jury that they
could draw no inference from the fact that the defendant was a
witness for the State on the trial of Bell, John Daniels, and
Fields for shooting his father; and no inference from the fact

that he assisted in the arrest of John Daniels when charged with · the same offence.

4. Because his honor erred in that he misquoted the testimony · in charging the jury in the following words: "It is not testified. in any way whatever that he (the defendant) was active in the matter." Whereas, it is respectfully submitted, that it was in evidence, and uncontradicted, that the defendant not only 'aided in the arrest of John Daniels when charged with shooting his father, but also testified against him.

5. Because his honor erred in that he plainly indicated to the jury that, in his opinion, the conduct of Lewis Williams and Bob Arthur strongly corroborated the testimony of William Scott, the chief witness for the State, by charging the jury in the following words: "He names Lewis Williams and Bob Arthur as the parties who were his co-conspirators. Is that true? The witnesses say that when Lewis Williams was arrested, he said not a word, he did not ask what he was arrested for, gave himself· up, and went to jail quietly. That is what they say—the three who arrested him. Does that corroborate William Scott's story that Lewis Williams was one of the party?. That is entirely for you. And you heard the witnesses' testimony about the different houses at which he was seen, the time he left home that afternoon, the course that he went, and the time he came up the next morning, and his subsequent conduct. I need not repeat it to you. Are you satisfied that William Scott and Lewis Williams. are the persons who took part in this most outrageous .murder?. And was Bob Arther the other party? All that you know of him outside of what William Scott says was having been seen. under certain circumstances after the killing. He has disappeared. There is no testimony whatever that will warrant you in holding any reasonable account for his disappearance. If he disappeared because he was fearful of being tried for a matter with which he is charged, how did he know that he was charged with a part of this matter? Who told him? . If some person told him, who was that person? I don't know. All I know is that he has disappeared. So you see, gentlemen, of the two persons who William Scott says took part in this murder, one. did not even ask why he was arrested, went to jail quietly, sub-

mitted; and the other has disappeared. Does that corroborate William Scott's testimony? Does it bring your minds to the unshaken conviction that William Scott has told the truth when he says that these two persons were those who took part in that murder? If you reach that conclusion, then, gentlemen, you will next inquire, what motive had they to do it? What motive had they to commit that murder?"

6. Because his honor erred in charging the jury in that he presented in a forcible manner his own opinion as to the motive which actuated the persons who killed Joseph James.

7. Because his honor erred in charging the jury in respect to matters of fact, so as to influence their judgment in determining the degree of credibility which they should attach to the testimony of the defendant, and to that of McKay, Hooten, and Haley, witnesses for the State.

8. Because his honor erred in that he expressed to the jury his own views as to the deportment of the defendant after the murder; and suggested the conclusions to be drawn from his conduct by using the following words in his charge: "The old man is killed; he is shot, and he cried out, 'Oh! Joe, I am shot and killed.' You have heard the testimony of the witnesses as to the conduct of Joe on that occasion, and you are to draw your own inferences from it. Was it that of an affectionate, dutiful son, or was it that of one different from an affectionate, dutiful son? Was his conduct such as to show any grief at all at the death of his father, any desire to bring the murderers to justice, or anything of the sort? What does he do? Where is the proof of anything he did to search out these murderers and bring them to justice? There was a reward offered by him subsequently; but the proof is, that he did not offer the reward until he was advised to do it, and there is no proof that until that time he ever did anything whatever to assist in searching out the murderers."

9. Because his honor erred in that he presented in his charge to the jury the strongest points in the testimony against the defendant, and omitted the facts and circumstances in his favor.

10. Because, it is respectfully submitted, that his honor erred in that his charge to the jury was an argument for the State, in violation of article IV., § 26, of the Constitution, and had the

effect to convince them that he had no confidence in the testimony of the defendant; that he was guilty of "hiring another to kill his father," and that unless he was convicted, "that father's blood would rest upon the hands of the jury."

*Mr. E. Keith Dargan*, for appellant.

*Mr. Johnson*, solicitor, contra.

July 5, 1889. The opinion of the court was delivered by

MR. JUSTICE McIVER. The appellant was indicted jointly with William Scott, Lewis Williams, and Robert Arthur for the murder of his father, Joseph James, and a motion to sever in the trial having been granted at a previous term of the court, the solicitor elected to try appellant first, and at March term, 1888, the appellant was tried and found guilty. Sentence having been passed, defendant appeals upon the several grounds set out in the record. The theory upon which the case for the State rested was that the appellant had hired his three co-defendants to kill his father by offering to pay each of them the sum of two hundred dollars : and the testimony mainly, if not entirely, relied upon to support this theory was the testimony of an admitted accomplice, William Scott, together with various circumstances which, it was claimed, supported or corroborated his testimony.

The testimony tended to show that the deceased was shot at night, just as he stepped out into the front piazza of the house where he and his son, the appellant, were then boarding; that the fatal shot was fired by Lewis Williams, the other two defendants, Scott and Arthur, being present, aiding and abetting, while the appellant was in the back part of the house taking a drink of water; that when the gun fired appellant and Howell, with whom he was boarding, went out on the front piazza, when they heard the exclamation alluded to in the judge's charge— "Joe, Oh! Joe, I am shot and killed"—and when asked by Howell what was the matter, deceased replied, "I am shot; they have killed me"; that search was immediately made for the assassin by Howell and appellant, which, proving to be ineffectual,

they hurried back to the old man, who very soon afterwards died.

. Testimony was also adduced to show that deceased had been. previously shot on three different occasions; that three persons, Bell, Daniels, and Fields, had been indicted and tried therefor; that on each of these trials appellant was a witness for the State; that he had assisted in the arrest of Daniels, who was convicted and sent to the penitentiary, and that the other two persons, Bell and Fields, had been acquitted. One James Hooten, whose character was attacked, was offered as a witness to show that appellant had attempted to hire him to kill his father, and one Hailey, whose character was likewise attacked, and one McKay, who was not attacked, were offered to corroborate Hooten's testimony, by showing that they were asked by appellant to carry messages to Hooten, though McKay does not say what was the purport of the message he was asked to carry, as he declined to bear any message at all. There was much other testimony, all of which is fully set out in the "Case," but the foregoing brief statement is sufficient to enable us to consider the several objections to the judge's charge.

The first ground of appeal is in the following words: "Because his honor erred in admitting in evidence the declarations of Joseph James, deceased, to the witness, D. C. DuBose, four weeks before his death." On turning to the "Case" we find that when the witness, DuBose, was on the stand he was asked the following question: " 'Shortly before the old man was killed, do you know, from what you ·heard either of them say, whether the relations between the old man and his son were friendly or hostile ?' Objected to. Objection overruled. Exception taken. 'A. From what I heard Mr. Joe James, senior, say, they were not friendly. He said that to me about four weeks before he was killed.' 'Q. Could you state whether he had hostile feelings or friendly feelings ?' 'A. My opinion was'— (interrupted.) Defendant's counsel objects to the opinions or impressions made on the mind of the witness by the declarations of deceased. Objection sustained. *By the Court:* 'My ruling is, that an expression of hostility is an act, not a declaration. I have not allowed declarations to be testified to.' *By the Court:* (To witness.) 'If

you heard him express hostile feelings towards his son, state it.' 'A. I did, sir.' Defendant's counsel asked that his exceptions be noted to all testimony as to expressions of hostility between the father and the son, and to all declarations of hostility."

From this extract from the "Case," showing what occurred at the trial in reference to the testimony objected to, it is very manifest that the Circuit Judge drew a distinction, whether well founded or not is not now the question, between expressions of hostility and declarations which the witness heard. This is clear from what occurred when Huggins, who was examined immediately before DuBose, was on the stand. For when Huggins was asked as to the relations between the old man and his son, and he replied that he could not tell, except what the old man told him five days before he was killed, he was not allowed to say what the old man told him, the court ruling that, in reply to the evidence adduced on the other side, to the effect that father and son were upon good terms, the witness might prove expressions of hostility, but could not be allowed to prove what words were used by the old man showing such hostility—could not prove the old man's declarations. Now, while the exception noted at the trial does embrace both points—expressions of hostility, as well as declarations—it will be observed that the first ground of appeal, which is all that we can properly consider, only imputes error to the Circuit Judge in excluding the *declarations* of the deceased, which, as we have seen, were expressly excluded.

But as this is merely technical, we would not be disposed, in a case of this gravity, to rest our decision upon it. Whether the relations between two persons are friendly or otherwise, may be testified to by a witness who has had an opportunity of observing the intercourse between them ; for although such testimony may, to a certain extent at least, be regarded merely as the opinion of the witness, yet it seems to fall under the exception to the general rule excluding opinions of witnesses, which exception, as is said in *Commonwealth* v. *Sturtivant* (117 Mass., 122, *S. C.* 19 Am. Rep., 401), cited with approval in *Jones* v. *Fuller*, 19 S. C., 68, "is not confined to the evidence of experts, testifying on subjects requiring special knowledge, skill, or learning, but includes the evidence of common observers, testifying to the results of their

observation made at the time in regard to common appearances or facts, and a condition of things which cannot be reproduced and made palpable to a jury." Amongst the numerous illustrations given in that case, and the note thereto, may be found the following : "So those who have observed the relations and conduct of two persons to each other, may testify whether, in their opinion, one was attached to the other," *McKee* v. *Nelson* (4 Cow., 355), or. "as to the degree of affection entertained by a wife for her husband, in an action of *crim. con.*," *Trelawny* v. *Colman*, 2 Stark., 191. It seems to us that the true rule is, that a witness, who has had an opportunity of observing the intercourse between two persons, may be asked the general question, whether the parties are friendly or otherwise, although his answer can be nothing more than an expression of his opinion, the correctness of which may be tested by a cross-examination as to the grounds upon which he bases his opinion ; yet when it appears that he speaks only from what he has heard one or the other say to himself or to third persons, it is nothing more than hearsay, and should be excluded upon that ground.

In all the other grounds of appeal, exception is taken to various portions of the Circuit Judge's charge to the jury, as being in violation of section 26, art. IV., of the Constitution, which is in these words : "Judges shall not charge juries in respect to matters of fact, but may state the testimony and declare the law." For a proper understanding of the case, it will be necessary that the charge of the Circuit Judge, together with the grounds of appeal, be fully set out by the reporter, although we do not deem it either necessary or desirable to consider specifically each of these grounds.

This imperative mandate of the constitution it is our plain duty to enforce, without regard to the consequences which may ensue in any particular case. Whether this is a wise or an unwise provision, we have neither the power nor the disposition to consider. It is enough for us to know that the people, in their sovereign capacity, have declared that judges "shall not charge juries in respect to matters of fact," and the only question which we have the power to consider is whether this imperative mandate has been violated in a given case. The first inquiry which naturally

arises is, what is the meaning and extent of the prohibition—judges shall not charge juries in respect to matters of fact? If that language stood alone, then the inference would be, that a judge, in charging a jury, should not say anything about the facts, for the broad terms used—*in respect to* matters of fact—would certainly warrant, if they did not require, the inference, that a judge was not at liberty even to speak of the facts; not at liberty to speak in reference to, or "*in respect*" to, them. But as that was not the intention, additional words are found in the clause which expressly permit the judge to *state* the testimony.

So that the practical inquiry is, what is the extent of this permission, following, as it does, and qualifying the previous absolute prohibition, which, without such qualification, would forbid any allusion to the testimony. To *state* the testimony certainly does not mean to *discuss* the testimony. for, to say nothing of the marked difference in the signification of these two words, such a construction would bring the latter part of the clause into direct conflict with the preceding imperative prohibition; for to *discuss* the testimony would certainly be charging, in respect to matters of fact, the very thing which is expressly forbidden. What, then, is the extent of the permission to state the testimony? Is it confined to a mere repetition of the testimony, as it fell from the lips of the witnesses, or does it extend to an arrangement of the testimony in the order in which it applies to the several questions of fact arising in the case, and, as thus arranged, laid before the jury by the judge? Ever since the cases of *The State* v. *Green* (5 S. C., 65), and *Redding* v. *Railroad Company* (*Ibid.*, 67), followed by *State* v. *White* (15 *Id.*, 381), down to the very recent case of *State* v. *Addy* (28 *Id.*, 4), the latter construction has been held the correct one; but it has been uniformly held that in thus laying the testimony before the jury, in its proper order, the judge must be careful to avoid expressing, or even intimating, any opinion as to the facts, and that if he does so, whether intentionally or unintentionally, a new trial must be granted. Under our constitution, the jury are the exclusive judges of the facts, and the true meaning and real object of the section of the constituion above quoted is that they must be left to form their own

judgment, unbiassed by any expressions, or even intimations, of opinion from the judge.

Looking at the charge in this case under the light of these principles, it is impossible for us to resist the conclusion, that the jury could not fail to see that his honor had very decided convictions against the prisoner upon many, if not most, of the material questions of fact in the case. This impression was left upon our minds on the first reading of the charge, and a careful examination of it has only served to deepen that impression. Whether the charge be considered as a whole, or the several points specified in the exceptions be considered separately, we think the jury were bound to see the leaning of the judge's mind. The declaration in the outset, that if the prisoner hired another to kill his father, none of that father's blood should rest on his hands, and that he had no reason to suppose that any one of the jury were disposed to differ from him in that determination, was well calculated to convey the impression that the blood of the deceased rested upon the head of the prisoner. He was the only person then on trial, and if the responsibility for that bloody deed rested neither upon the judge nor the jury, where else was it to rest, except upon the prisoner?

Then the manner in which the testimony adduced to corroborate the testimony of William Scott was presented to the jury, and the remarks made as to the motive for the killing, excluding all idea of the motive being robbery, and presenting in the strongest light the idea that it was for the bribe alleged to have been offered by the prisoner to any one who would take his father's life; the discussion of the testimony of Hooten and the evidence relied on to corroborate him, especially in connection with the suggestion, that he was just such a person to whom such an infamous offer would likely be made; the suggestion that the reward offered by the prisoner for the discovery of the murderer of his father might have been prompted by other than the ostensible motive; the intimation that the prisoner might have put the officers of the State upon the wrong track when they were trying to find out who had shot the deceased on previous occasions; the comments on the conduct of the prisoner after his father was killed; these and other portions of the charge, which it is deemed

unnecessary to consider specifically, could not fail to indicate to the jury the opinion of his honor.

But, in addition to this, when the judge, in commenting on the testimony adduced to show that the prisoner had been active in the prosecution of others who had previously shot his father, he explicitly instructed the jury that they could draw no inference favorable to the prisoner from such testimony—that they could draw no inference from the fact, that the prisoner had testified as a witness for the State on the trial of these parties, and had assisted in the arrest of Daniels, who was convicted—it seems to us clear that he plainly invaded the province of the jury, and forbid them from doing what it was their exclusive province to do—draw inferences from the testimony adduced. The jury being the sole judges of the facts, it is for them, and not for the judge, to say whether any inferences, and, if so, what, shall be drawn from the testimony, and it is a plain violation of the constitutional provision above referred to for the judge to instruct the jury that no inference can be drawn from any given portion of the testimony. If it were otherwise, then it would be practicable for a judge, in effect, to dictate the verdict.

Without going into any further discussion of the charge, it seems to us clear, that, whether the charge be considered as a whole, or as to those portions of it specifically mentioned in the exceptions, it was in violation of the provision of the constitution; and for this reason we are compelled to grant a new trial. We desire to say, however, that we are not to be regarded as either expressing or even intimating any opinion as to the correctness or incorrectness of the verdict. That is a question which it is beyond our province to consider, and has, therefore, not been considered. Our action, in granting a new trial for the errors of law indicated, is not entitled to have, and should not have, the slightest influence, either one way or the other, upon the next jury called upon to pass on the facts of the case, as they may then be presented to them.

The judgment of this court is, that the judgment of the Circuit Court be reversed, solely on the grounds indicated, and that the case be remanded to that court for a new trial.